115   62
122   745

115   62
138 · 25

115   62
142   198

### S. R. MOORE v. D. D. HOWE and L. CARTER, Appellant.

**False Representation in Sale:** KNOWLEDGE OF PURCHASER. Where plaintiff exchanged his farm for a stock of goods, and subsequently sued for damages on the ground that defendants had defrauded him, that one of the defendants had previous to the transaction held himself out as owner was of no avail; it appearing that plaintiff learned before the contract was signed that the stock belonged to the other.

WAIVER. The fact that almost worthless goods had been introduced into the stock after the contract was made was of no avail; it appearing that at the time of the trial he had demanded a discount because of their condition, and had obtained it.

*Same.* Where plaintiff, who owned a farm, exchanged the same for defendant's stock of goods, he could not thereafter complain of the values placed on certain fixtures, etc., by defendants, when the means of knowledge were as equally available to him as to defendants.

ESTOPPEL TO RESCIND. Where plaintiff, who owned a farm, exchanged the same for defendants' stock of dry goods, and continued to sell from such stock for four months thereafter, such conduct, as a matter of law, precluded a subsequent rescission of the contract on the ground that defendants had defrauded him by placing too great a valuation on the stock.

**Chattel Mortgage:** PAROL VARIANCE: *Foreclosure clause.* Where one gives a chattel mortgage which provides that if the mortgagee shall deem himself unsafe he may foreclose, under an allegation of fraud, parol evidence is not admissible to show an agreement that the mortgage should not be foreclosed within a year, unless the mortgagor was induced, in signing it, to believe that it contained stipulations not included therein.

*Appeal from Cerro Gordo District Court.*—HON. C. H. KELLY, Judge.

WEDNESDAY, OCTOBER 23, 1901.

THE plaintiff exchanged 210 acres of land in Moody county, S. D., for a stock of goods at Clear Lake, Iowa. The farm was incumbered, and for computed difference in value

he executed his note to defendant Howe for $1,452, payable in one year, and secured it by chattel mortgage on the stock. January 11, 1897, this mortgage was foreclosed, and the stock bid in by Howe for precisely enough to satisfy the debt. This action was begun April 22, 1897. In it the defendants are alleged to have conspired to obtain, and in pursuance thereof have obtained, plaintiff's land without paying for it; and judgment is prayed for its value above incumbrance, or $3,850. Issue was joined, and the cause tried to a jury. Verdict was returned for plaintiff, and judgment entered thereon. The defendants appeal.—*Reversed.*

*Cliggitt & Rule* and *Stanbery & Clark* for appellants.

*Blythe, Markely & Smith* and *D. W. Hurn* for appellee.

LADD, J.—That the plaintiff was overmatched in exchanging his farm of 210 acres in Moody county, S. D., for the stock of goods at Clear Lake, Iowa, this record furnishes convincing proof. But such a result is likely to, and often does, occur in trades honestly conducted; and certainly this record contains no evidence of fraud of which he may now complain. He was not wholly unsophisticated, having had 2½ years' experience in the operation of a general store, 1 year in that of a drug store, and for a short time dealt in agricultural implements though engaged as a tiller of the land for 10 years previous to the examination of the stock of goods, evidently put together and arranged for the purposes of exchange. If Carter, preliminary to the transaction, held himself out as owner, Moore learned that the stock belonged to Howe before the contract was signed. If Carter represented the goods to be good and salable, Moore had knowledge to the contrary before accepting them. Whether the cloth and velvet buttons, the beaded trimmings, the soiled ladies' hats, and the cloaks, all out of style, or some of these were introduced in the stock after the contract was entered into, or were overlooked by Moore in

his examination, is now immaterial; for he, with precisely the knowledge he had at the time of the trial, and knowing that they were included in the invoice, demanded a discount because of their condition, and obtained it. Before the inventory was completed he concluded not to take stock, and left for his hotel. Doubtless this avoided friction in the invoicing of the fixtures, as Carter completed it alone, and according to his own notions as to values, and what should be treated as fixtures. But this, also, was with full knowledge accepted. It is claimed that plaintiff did not observe the holes gnawed in some of the cloaks by mice, nor the frayed and faded condition of the dress goods, until after he had taken possession. But these were open to his inspection, and as accessible to him as any one else. What he actually saw put him on inquiry, and, if he did not ascertain their condition, it was owing to his own neglect. When the means of knowledge are at hand, and equally available to both parties, and the subject is alike open to their inspection, if the purchaser does not avail himself of these means he will not be heard to say that he has been deceived by the vendor's misrepresentations. *Slaughter v. Gerson,* 80 U. S. 379 (20 L. Ed. 627); *Bell v. Byerson,* 11 Iowa, 233; *Poland v. Brownell,* 131 Mass. 138 (41 Am. Rep. 215); *Ellis v. Andrews,* 56 N. Y. 83 (15 Am. Rep. 379). True, Carter bragged on the goods; but no more than was permissible, in view of the fact that this did not deter plaintiff from examining them. Indeed, it appears that the bragging and examination went on at precisely the same time, and that plaintiff admits that before the completion of the invoice he actually noticed the holes in some of the cloaks. But there is another circumstance in the way of a rescission by plaintiff: Notwithstanding the discovery of defects alluded to, the plaintiff continued to treat the stock as his own and sell therefrom up to January 11, 1896,—nearly four months after the trade. Upon the discovery of the imposition, if any, practiced upon

him, he should have made his stand. A party to an agreement induced by fraud or deceit is held to the duty of electing either to execute or rescind the contract at the time of discovering the wrong, or within a reasonable time thereafter. *Rawson v. Harger,* 48 Iowa, 269. Sometimes this question as to what is a reasonable time is for the jury, but we have no hesitancy in saying, as a matter of law, that the retention of a retail stock of goods, and sale therefrom in the ordinary course of business, and appropriating the proceeds thereof, for nearly four months after acquiring knowledge of the alleged fraud, will preclude a subsequent rescission of the contract. Such treatment of the property is an unequivocal election to accept the goods and carry out the contract. Taking any benefit or changing the condition of the property bought after learning of the fraud has been adjudged a waiver of the right to rescind. *Cobb v. Hatfield,* 46 N. Y. 533; *Negley v. Lindsay,* 67 Pa. 217 (5 Am. Rep. 427). Continued dealing with or use of the goods purchased in reference to the fraudulent transaction as if it were subsisting and binding is also such a waiver. *Bassett v. Brown,* 105 Mass. 551; *Schiffer v. Dietz,* 83 N. Y. 300; *Foster v. Rowley,* 110 Mich. 63 (67 N. W. Rep. 1077). Having made his election, plaintiff must abide by it.

II.   The evidence tended to show that Carter induced some one to buy sugar of plaintiff during the invoice, and also that the latter turned a safe over to his agent at a fixed price. The defendants insisted that these transactions amounted to an acceptance of the stock, and, when the plaintiff hesitated to consummate the trade, threatened, through their attorney, to bring suit. After some parley the amount of the invoice was reduced about $200, so as to leave the excess of the stock above plaintiff's interest in the land exactly equal to the mortgage thereon; and he executed a chattel mortgage on the stock, securing payment thereof. Before doing so, however, plaintiff insists the de-

fendants, through their attorney, promised not to record the mortgage, and not to foreclose it within one year. That instrument provided, among other things, that, "should the said D. D. Howe at any time deem himself unsafe, then it shall be lawful for said D. D. Howe, his heirs, agents, or assigns, to take the property, and, after giving ten days' notice and place of sale, * * * to sell said property at public sale, whether said debt is due or not." It was executed September 12, 1896, and foreclosed on the eleventh day of January, following. The conditions of the mortgage were not concealed from plaintiff, nor does he pretend to have been ignorant of its contents at the time of its execution. His claim, in substance, is that he was induced to give a mortgage authorizing Howe to foreclose whenever he should feel insecure by an oral promise not to foreclose within one year. He now urges that foreclosure according to the terms of the contract has established the secret intent of the mortgagee to violate his oral promise, and thereby the design of obtaining the farm without compensation has been proven. Promises are often the devices resorted to for the purpose of accomplishing fraud, and sometimes the most effectual means to that end. *Goodwin v. Horne,* 60 N. H. 486; *Russ Lumber & Mill Co. v. Muscupaibe Land & Water Co.,* 120 Cal. 521 (52 Pac. Rep. 995, 65 Am. St. Rep. 186); *Sweet v. Kimball,* 166 Mass. 332 (44 N. E. Rep. 243, 55 Am. St. Rep. 406); *Lee v. Lemart,* 26 Kan. 111; *Swift v. Rounds,* 19 R. I. 527 (35 Atl. Rep. 45, 33 L. R. A. 561, 61 Am. St. Rep. 791); Cooley, Torts, 487. Such are cases of concealed insolvency, where the purchase is with intention not to pay. But we have discovered no case where parol proof of such a promise has been received in evidence where the parties have reduced their agreement on the subject to writing. To hold evidence of an oral promise admissible under such circumstances would result in frittering away both the rule excluding oral proof contradicting the terms of a written instrument, and that forbidding testimony of ar-

rangements preceding, and usually held to have been merged in, the written agreement.   For all that would be necessary to secure the admission of such evidence would be an averment of fraud, which might be established by showing a different oral understanding, otherwise held to have been merged in the writing, and a breach thereof in carrying out the written instead of the preceding oral contract.   We are not ready to indorse any such doctrine.   The plaintiff knew or is at least presumed to have known, the contents of the mortgage before signing it; and if there was any understanding, contrary to its provisions, prior to its execution, it may not be shown, as the written agreement, finally executed, is conclusively presumed to be that intended by the parties.   Under the allegation of fraud, no evidence was admissible of any of the negotiations leading up to the making of the mortgage, unless it appeared that plaintiff believed, and was induced to believe, in signing it, that it contained conditions or stipulations not included therein, or omitted some that he was led to suppose were included.

III.   We have been unable, after a most careful examination of the record, to discover any evidence of fraud of which the plaintiff may complain.   The verdict is entirely without support in the evidence.   That this is a second verdict furnishes no reason for not setting it aside, when not based on proof sufficient to sustain it.   *Carlin v. Railroad Co.*, 37 Iowa, 316; *State v. Billings*, 81 Iowa, 100.—REVERSED.

SHERWIN, J., took no part.