Clampitt et al. *v.* Doyle.		*73 Eq.*

—————

JAMES A. CLAMPITT et al., respondents,

*v.*

JOHN DOYLE, appellant.

[Argued January 9th, 1908.   Decided June 15th, 1908.]

A purchaser who has been led into a contract of sale by false representations that entitled him to rescind the contract has but one election to rescind which he must exercise with reasonable promptitude after his discovery of the falsity of the representations that induced his purchase; beyond this mere delay in the rescission of the contract may amount to satisfactory evidence of an election to abide by the contract notwithstanding the fraud.

———

On appeal from a decree of the court of chancery advised by Vice-Chancellor Bergen.

*Mr. Thomas B. Harned,* for the appellant.

*Mr. Lewis Starr* and *Mr. Harrison H. Voorhees,* for the respondents.

The opinion of the court was delivered by

GARRISON, J.

The complainants' bill was filed to set aside an executed contract of sale by which John Doyle, the defendant, had turned over to the complainants the steamboat "Major Reybold" and

certain wharf properties in Salem county for the consideration of $31,500. The details of the sale involved the transfer of Doyle's stock in a corporation that owned the "Reybold," but in its equitable aspect the transaction may be treated as a sale by Doyle to the individual complainants who constituted a purchasing syndicate. The equitable ground of the bill is that the sale in question was brought about by the false representation of Doyle that the yearly gross receipts of the "Major Reybold" were $35,000 and that her net annual income was $10,000. The learned vice-chancellor who heard the cause, upon reaching the conclusion that such representations had been made on behalf of Doyle and that they were false and had induced the purchase, advised a decree setting aside the sale and relegating the parties to their original status by the reconveyance of the property to Doyle and the repayment of the purchase price by Doyle to the complainants. From this decree Doyle has appealed.

In the view that we take of the case it is unnecessary for us to determine whether the conclusions of fact reached by the learned vice-chancellor are justified by the proofs. For if it be assumed that the representations of Doyle as to the receipts and profits of the boat were proven so that the purchasers upon the discovery of their falsity were entitled to elect to rescind the contract of sale on that account, still such election to have weight in equity must have been made promptly and unequivocally upon the discovery of the fraud, *i. e.,* it must have been an unqualified election to repudiate the entire bargain made with reasonable promptness after its fraudulent nature became apparent. Assuming fraud in a vendor and its discovery by the vendee an election by the latter to rescind the contract of sale cannot follow an election not to rescind; and mere delay, *i. e.,* lack of reasonable promptness in rescission after the discovery of the fraud is evidence from which an election not to rescind may be inferred. There is, in fine, in equitable contemplation, but one juncture at which a purchaser who has been induced by fraud to enter into a contract of sale may elect on that account to rescind the contract, and that is upon his discovery of the fraud or within a reasonable time thereafter; beyond this period mere delay in rescission may be satisfactory evidence of a waiver of the right to rescind. That

such election if made or when made is final is also established law. *Dennis* v. *Jones, 44 N. J. Eq.* (*17 Stew.*) *513.*

The application of these general rules to the case in hand will be apparent upon a ·brief resumé of the facts and dates established by the testimony. In the summer of 1905 John Doyle, as owner of the boat "Reybold," is said to have made the representations as to the earnings of the boat to a broker who was not at that time negotiating with the complainants. Nearly a year later these representations were communicated by the broker to the complainants and induced their purchase of the boat. On March 1st, 1906, the sale was executed and the property turned over by Doyle to one Sproule, the representative of the purchasers. On March 5th, two weeks before the complainants began running the boat, Doyle, according to the complainants, informed Sproule, then their trustee, that the boat was worn out, that no one would ride in her and that the complainants would be unable to make both ends meet. At this same time Doyle exhibited his check for $1,500, stating that it was the amount of the commission he was to pay to two members of the purchasing syndicate, whose personal interest in effecting the sale was a surprise to the other purchasers and threw light upon an advance of $1,500 on the purchase price made pending negotiations. On March 19th the complainants began operating the "Reybold" between Philadelphia and Salem, New Jersey, and early in April, according to the complainants, Doyle told the president of the company that the boat would not make the amount that he had said she would, a fact that was indeed otherwise self-evident. Notwithstanding these circumstances and disclosures which constitute the proof of the falsity of Doyle's representations, the complainants continued to operate the boat during the spring, summer and fall of that year, and not until December 16th, 1906, was the election·to rescind the contract communicated to Doyle by a written tender to him of the property, after he had refused to entertain an offer to repurchase it made to him a short time previously. That this delay of several months was with the purchasers' knowledge of the fraud that had been practiced upon them is frankly admitted on the witness stand by Mr. Sproule, who throughout the transaction had been

the representative and trustee of the purchasers. In response to the question of his counsel: "After you had conversed with Captain Doyle subsequent to the time the transfer was made when did you consult counsel relative to the matter?" The answer was, "We went along for some time after discovering the representations that had been made and we consulted counsel the first of September of last year." Inasmuch as the conversation with Doyle referred to in this question was that of March 5th, already cited, a delay of six months is admitted to have occurred before even consulting counsel, and after that no election to rescind was made until nearly four months later, viz., on December 16th, 1906. That so long a period was reasonably necessary in order to ascertain whether the receipts would in fact amount to $35,000 and the net profits to $10,000 is totally inconsistent both with the proofs and with the whole framework of the complainants' case, which was that the disparity between the receipts of the boat and the representations of Doyle was so great as to shock the conscience. The more likely explanation of the delay is that the margin of profit to the purchasers on their investment of $31,500 was so great that business prudence suggested that the bargain might be a good one notwithstanding the annual profit was less than $10,000. At that rate of profit the sum invested would have yielded an annual dividend of over thirty-one per cent. It may well be therefore that if the boat showed earnings of one-half or even of one-third of the sum represented by Doyle the purchasers would still prefer to hold on to so profitable a bargain. This, however, while sound as a business proposition, would be fatal as a basis for equitable relief; it would be, in fine, one of those elections not to rescind that are inferable from mere delay in rescission.

The facts that were before this court in the case of *Dennis* v. *Jones,* already cited, are in their essential features so nearly identical with the facts now before us that the equitable rule then applied is obviously applicable to the present case.

In *Dennis* v. *Jones* the essential facts were that on February 14th, 1885, Jones agreed to sell his skating rink to Dennis and Woglom for $10,000, of which sum the purchasers paid $5,000 upon entering into possession and secured the remaining $5,000

by a mortgage on the rink. On the foreclosure of this mortgage in September of the same year the purchasers set up the defence that Jones had represented to them that his net profit in operating the rink had been $1,000 per month, and that the rink was patronized by numbers of the most respectable people in the town. Assuming these representations to have been proven it was further established by proof that within a week from the time the purchasers took possession of the rink they discovered that the conduct of some of the former employes with disreputable characters who had been allowed to frequent the place had driven away many of the better class of patrons, and they also speedily found out from the receipts of the rink that the net profits to be derived from its operation were inconsiderable in comparison with a net profit of $1,000 per month. "So great indeed," to quote from the opinion, "was the disparity between the appellants' receipts and the profits which they allege the respondent claimed to have received that it was plainly impossible for his representations to have been true." Notwithstanding that this discovery was made early in April the purchasers did not make their election to rescind the sale until some time in September following when, according to the opinion, "it became plainly apparent that the popular furore for roller skating was waning and that the business they had entered upon must soon collapse." "Under this condition of affairs," the opinion continues, "they now seek to rescind their contract because of the fraud they allege to have been practiced upon them. It is unnecessary for us to determine whether the proofs establish the fraud, for it is apparent that, if there was in fact the fraud complained of, it in substance became manifest to the appellants months before the foreclosure suit was commenced. When it was discovered, it was the appellants' duty, with all reasonable diligence, to disaffirm the contract. They could not derive all possible benefit from the transaction and then be relieved from their obligation by a rescission or refusal to perform on their part. It would be most inequitable to permit them to hold the rink and its business, in apparent acquiescence in the fraud, until the collapse of the business was assured, and then rescind their contract."

"It is the rule that the defrauded party to a contract has but one election to rescind, that he must exercise that election with reasonable promptitude after discovery of the fraud, and that when he once elects he must abide by his decision. *Big. Fraud 436.* Delay in the rescission of the contract is evidence of a waiver of the fraud, and an election to treat the contract as valid. *Williamson* v. *New Jersey Southern Railroad Co., 29 N. J. Eq. (2 Stew.) 311, 319; Brown* v. *Mutual Benefit Life Insurance Co., 32 N. J. Eq. (5 Stew.) 809; Oakey* v. *Cook, 41 N. J. Eq. (14 Stew.) 350; Big. Fraud 438; 2 Pom. Eq. Jur. 817; Baird* v. *New York, 96 N. Y. 567; Farlow* v. *Ellis, 15 Gray 229.*

"I think," the opinion concludes, "that in the case now considered it is plain that after the appellants had knowledge of all the substantial features of the alleged fraud and were fully aware of the deceit which had been practiced upon them, they so acted as to afford plenary evidence of an election to abide by their contract. Their election thus made was irrevocable."

The case now before us is even stronger upon its facts than that just cited for the reason that the nature of the enterprise and the relative situation of the parties more imperatively called for promptness in the restoration of the original status. Doyle was a South Jerseyman, a resident of Salem county, with a lifelong acquaintance among the shippers of that farming community. He had worked on the "Major Reybold" first as a deck-hand, afterward as fireman, then as second engineer, and finally as chief engineer, and in 1893 purchased the boat and became her captain. It is fair therefore to assume that Doyle was a well-known character in Salem county and that the local business he controlled was largely due to his personality and wide acquaintance. The complainants, on the other hand, were strangers to Salem county, and were not steamboat men at all. During the period, therefore, that the boat was being operated by these novices in the business it was naturally to be anticipated that the trade previously held together by Doyle would slip away or be diverted into other channels, and also that active and permanent opposition would be invited and developed. Such was actually the case. When, therefore, in December, 1906, the purchasers made their belated election to return the boat to

Doyle and to demand back the purchase price the status of the parties had widely altered from what it had been at the time of the purchase of the boat or from what it would have been had the purchasers elected to rescind their contract with reasonable promptness upon their discovery of the falsity of Doyle's representations. In fine, as was said by this court in *Dennis* v. *Jones,* "They so acted as to afford plenary evidence of an election to abide by their contract and their election thus made was irrevocable."

Other cases illustrative of this rule are *Arnold* v. *Hagerman, 45 N. J. Eq. (18 Stew.) 186; Norfolk, &c., Hosiery Co.* v. *Arnold, 49 N. J. Eq. (4 Dick.) 390; Conlan* v. *Roemer, 52 N. J. Law (23 Vr.) 53.*

The decree of the court of chancery is reversed, and the record remitted that the complainants' bill may be dismissed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BOGERT, VROOM, GREEN, GRAY, DILL—11.