D. H. TIDGWELL, Appellant, v. NETTIE M. BOUMA et al., Appellees.

**VENDOR AND PURCHASER:** Rescission—Laches. Rescission of a
1  contract on the ground of discovered fraud must be made promptly
—within a reasonable time—or the right will be lost. So held
where a land deal, alleged to have been induced by fraud, remained
unquestioned for 4½ years, of which time 2½ years was with
knowledge of the alleged fraud.

**CONTRACTS:** Rescission—Rescission in Spite of Laches—Condi-
2  tions. The right of rescission of a fraud-induced contract, when
the one seeking rescission has been guilty of laches in making re-
scission, can be saved only by a plain showing by the one seeking
rescission that the court may, without speculation, and in spite of
said laches, still enter a decree which will place the other party to
the contract against whom belated rescission is sought in identi-
cally the same position that he would have occupied had the rescis-
sion been timely.

**VENDOR AND PURCHASER:** Fraud—Affirmance—Acts of Owner-
3  ship. The exercise of acts of ownership over property by the
victim of a fraud-induced contract may work an irrevocable elec-
tion to affirm the contract and waive rescission.

PRINCIPLE APPLIED: Plaintiff, in March,. 1907, sold his
Iowa farm and received in payment certain notes signed by a re-
putedly wealthy party, and also secured by mortgages on lands in
foreign states. The maker was, or became, insolvent, and the
foreign land of little value. Conceding, *arguendo*, that plaintiff
was defrauded in the deal, yet he knew of the fraud and the worth-
lessness of the notes as early as 1909. Later, he attempted to
trade off the notes. In 1910, he placed the notes in judgment
against the maker, and later assigned the judgment to a third
party, but under some agreement, as he claimed, by which he could
at any time have it back. In 1911, he procured the said maker to
convey to him some of the foreign land on which the notes were
secured, under agreement to apply on said judgment the proceeds
realized. In August, 1911, plaintiff brought action to rescind the
contract for fraud. *Held,* the conduct of plaintiff amounted to an
irrevocable election to affirm the contract and not to rescind.

*Appeal from Howard District Court.*—W. J. SPRINGER, Judge.

MONDAY, APRIL 10, 1916.

ACTION in equity to cancel a deed on the ground of fraud. Decree for the defendants in the court below. Plaintiff appeals.—*Affirmed.*

*J. M. Whitaker,* for appellant.

*John E. Cross,* for appellees.

GAYNOR, J.—This is an action in equity brought by the plaintiff to set aside and cancel a certain deed executed and delivered by him to one of the defendants, Nettie M. Bouma. The ground of the action is fraud alleged to have been committed by the defendant B. T. Bouma, husband of the other defendant. The land involved is 160 acres in Howard County, in this state.

The petition alleges that the defendant B. T. Bouma and one Herman Rietveld, prior to March 18, 1907, confederated and conspired together for the purpose of cheating and defrauding this plaintiff; that, at the time of the conspiracy, Rietveld was a banker residing in the city of Pella, Iowa, and reputed by the general public to be worth $75,000 or more, but in fact, at the time, was wholly insolvent; that this fact was well known to the defendant Bouma; that Bouma was a real estate agent; that Bouma and Rietveld conspired and agreed together that Rietveld, without any consideration therefor, would execute and deliver to said defendant his promissory notes; that Bouma should trade, sell or negotiate the same for money or other property, and that they would divide the proceeds received therefrom between them; that, to effectuate this fraudulent purpose, and in pursuance thereof, Rietveld executed and delivered to the defendant his promissory note for $4,000, and executed to him a mortgage on 160 acres of land in Nebraska, ostensibly to secure the same; that, at the time of the execution of the mortgage,

Rietveld had the record title to the land; that, at the same
time, and for the same purpose, Rietveld executed and deliv-
ered to the defendant Bouma his note for $2,500, ostensibly
secured by a mortgage on 120 acres of land in Madison
County, Arkansas; also a promissory note for $2,000, ostensi-
bly secured by a mortgage on 120 acres of land also in Madison
County; that the lands described in said mortgages and
pledged to secure said notes were practically worthless, and
were not worth more than $2 an acre, which facts were well
known both to Bouma and Rietveld, at the time of the execu-
tion of the said notes and mortgages; that, about the time
mentioned, the plaintiff Tidgwell was the owner of 160 acres
of land situated in Howard County, this state; that the de-
fendant Bouma represented that the land described in said
mortgages was well improved, with good fences and buildings,
and was productive, that the title to the land was perfect in
the mortgagor, and the maker of the notes solvent, whereas,
as a matter of fact, the land was practically worthless, and
the title of the mortgagor imperfect, and the mortgagor
insolvent, and the notes and mortgages were practically worth-
less; that, in the month of March, 1907, the plaintiff traded his
land in Howard County for the said notes and mortgages.
At the time of the execution of the deed by this plaintiff to
the defendant for said notes and mortgages, the maker of the
notes, Rietveld, was insolvent and financially worthless, and
still is insolvent and worthless; that all the statements as to
the value and conditions of the mortgage securities were abso-
lutely false at the time that they were made; that the securi-
ties were worthless, and are still worthless.

Plaintiff further alleges that, subsequent to said exchange
of properties, plaintiff put said notes in judgment against said
Rietveld in Marion County, Iowa; that said notes are now
in possession of the clerk of said court, by reason of which
fact plaintiff is unable to tender them back, but plaintiff offers
to assign to the defendants the judgment obtained upon said

notes, and to return all the mortgages and other evidence received by him in said exchange. Plaintiff says that he was entirely ignorant of the facts herein recited, at the time that he made the exchange, and did not discover their falsity until a short time before the commencement of this action; that the name "Nettie M. Bouma" was inserted in the deed at the time that it was made, at the request of the other defendant, her husband, and without any consideration passing therefor. Wherefore, the plaintiff prays that the deed be canceled and set aside; that the title to the Howard County land be quieted in him, and that he have judgment for the fair rental value of the property during the time that it has been in the possession of the defendants.

Defendants for answer admit that Herman Rietveld was a banker in the town of Pella at the time of the happening of the matters complained of; that he had record title to the land described and the mortgages referred to; that he was generally reputed to be worth $75,000; that the plaintiff was the owner of the land in Howard County referred to; that about the 18th day of March, 1907, plaintiff conveyed said land to defendant Nettie M. Bouma by deed; that, in consideration for the conveyance, the defendant B. T. Bouma traded to him one promissory note for $4,000 by Rietveld to Bouma, and endorsed by Bouma without recourse to the plaintiff; that the note was secured by a mortgage on 160 acres of land in Holt County, Nebraska, then owned by Rietveld; also one promissory note for $2,500, executed by the same party to the same party, and endorsed to the plaintiff without recourse, this note secured by a mortgage on land in Madison County, Arkansas; also a note of $2,000, executed by the same party to the same party, and endorsed without recourse to the plaintiff, said note being secured by mortgage on land situated in Madison County, Arkansas. It is further admitted that the notes were by the plaintiff reduced to judgment in July, 1910. They deny all other allegations. As a defense, however, it is pleaded that, before accepting said notes, the

plaintiff investigated for himself the character and value of
the notes, and, after such investigation, relied wholly upon
his own judgment and upon the information so received, in
making the trade; that, on the 8th day of July, 1910, the plain-
tiff, with full knowledge of all the conditions now complained
of, and with full knowledge of all the facts connected with
the transaction in question, elected to treat the promissory
notes as his own, and, without any notice to these defendants
of the intention to repudiate the trade, he reduced said notes
to judgment against Rietveld; that, after reducing the notes
to judgment, in the fall of the year 1911, and before the
commencement of this action, the plaintiff procured the said
Rietveld to convey to him the land in Holt County, Nebraska,
and agreed to and did accept said conveyance as a full and
complete satisfaction and payment of the judgment rendered
and security on the notes, thereby releasing and discharging
this defendant, and thereby rendering it impossible for him
to put the defendants *in statu quo*. Wherefore, the defend-
ants say that, by reason of the facts aforesaid, the plaintiff has
ratified and confirmed the trade in question, and has been
guilty of laches in asserting his claim against the defendants,
and is now estopped to demand the relief asked for. They
pray that plaintiff's claim be dismissed and title quieted in
defendants.

In April, 1912, since the commencement of this suit, the
plaintiff sold and assigned to H. O. Michaels the judgment
obtained by him against the said Rietveld upon the notes
referred to in plaintiff's petition.

Upon the issues thus tendered, the evidence was intro-
duced, and, at the conclusion of all the evidence, the court
entered judgment for the defendants dismissing plaintiff's
petition, and from this, plaintiff appeals.

The evidence in this case is conflicting. It is triable *de
novo* here. We are not bound to accept the testimony of any
witness as true, nor may we assume a fact established because
a witness has been produced whose testimony tends to estab-

lish it. Our only duty is to account, if possible, for this
conflict in the evidence; to reconcile it where it can be recon-
ciled, and ultimately to ascertain out of it all what the truth is.

There is much in this record that reflects upon the char-
acter and integrity of some of the witnesses on whom the
greatest reliance is placed to establish plaintiff's contention.
The plaintiff alleges a conspiracy entered into between Bouma
and Rietveld. A conspiracy consists in an alleged under-
standing and agreement entered into between them, by which
Rietveld was to execute to Bouma certain notes, Bouma, to
sell or trade them for other property, and the proceeds so
obtained, to be divided between them. It is conceded that Riet-
veld, at the time that these notes were executed, and for
some time prior thereto, was generally reported to be a
wealthy man, and responsible for his obligations. It is claimed
that this was known to Bouma and Rietveld; that, in making
these notes, they speculated upon this seeming solvency of
Rietveld; that both parties at the time knew that he was
insolvent, and that the notes were worthless. This conspiracy
is testified to by Rietveld alone; denied by Bouma. Rietveld
himself makes the shameful confession without shame, and
says that he was wholly insolvent at the time that these notes
were made; that both he and Bouma knew this fact; that the
notes were made for the purpose of being palmed off on an
unsuspecting public as of value, when, in fact, they had no
value, and that he was to share in the profits of the wicked
scheme. Touching the conspiracy, Rietveld said:

"It was arranged and agreed that I should sign certain
notes and mortgages which he (meaning Bouma) would have
made payable to himself, and seemingly secured by real estate
mortgages on property of little or no value, on which I had
no title or equity, and he was to trade these off for property
and give me half of the proceeds."

He said that the land on which the mortgages were given
was of little or no value; that some of it he had no title to;
that he had never seen the land in Arkansas; that Bouma

had seen all the land described in the mortgages, and knew all about it, and knew that it was of no value. He said that he never owned any land in Madison County, Arkansas; never bought any there; never paid for any; in fact, never had any; that he received no consideration from Bouma for the notes; that the only arrangement was that he should make the notes and mortgages, Bouma should dispose of them, and they would divide what they got out of them. He further testified that Bouma said that the public did not know his financial condition, and would not find it out until they traded the paper off; that this would make both of them money. He further testified that Bouma, since the commencement of this action, said that, if he (Rietveld) would stay by him in the matter and he could win it, he would have the Howard County land—the land in controversy—deeded to him (Rietveld). His testimony was taken by way of depositions. He said:

"I got a copy of these depositions two or three days before my deposition was given before the notary; I wrote my answers in before I appeared before the notary, and I read my answers to the notary as they appeared in the copy."

There is no question, for it is admitted, that the public generally supposed Rietveld to be worth from $75,000 to $80,000 at that time. He had been in the banking business. His father was in the banking business—the father a reputable and worthy man, as this record shows. We must judge the testimony of Rietveld in the light of his own confessions. What influences were brought to bear upon him to induce him to make these statements now relied upon by the plaintiff and set out in the deposition are not made plain in this record. The pressure, however, that was brought to bear upon the other witnesses in this case to induce them to swear to facts serving the plaintiff's purpose, would suggest that the same hand was at work in influencing this man to give the testimony that he has given. The plaintiff, for 4½ years after this exchange was made, made no complaint to anyone of the conduct of Bouma, nor did he suggest that Bouma had prac-

ticed any fraud upon him. Not until after this matter got into the hands of H. O. Michaels did the theory develop, upon which this case has been presented to this court. Michaels was the controlling spirit after his entry into the case, and he was also a witness for the plaintiff upon the trial. It was through him that this suit was commenced. He was to receive one third of all that was recovered. He was to receive one third of this farm if plaintiff recovered it. He took an assignment of the judgment and did not pay any consideration for it. Plaintiff testifies that Michaels now owns the judgments, but claims that he may have them back at any time, if the court orders them to be turned over to the defendants. This party visited Hawkins, the attorney who obtained the judgment, and made a vigorous effort to influence his testimony; visited Mr. Bouma and threatened him with criminal prosecution. In his own testimony, he says that he said to Hawkins and Bouma:

"If you will take care of me and my part of it, you gentlemen can make any settlement you care to with Mr. Tidgwell; one third of whatever I collected of the obligations Mr. Tidgwell had against Mr. Hawkins, Mr. Rietveld, Mr. Bouma and Mr. Hardy." (Mr. Hardy was the agent by whom the trade was effected that is now complained of.)

He further said, in conference with Bouma and Hawkins:

"I told them: 'You just deed the farm to me. I have the power of attorney to act for Mr. Tidgwell.' I said: 'If you deed this farm to me, gentlemen, Mr. Tidgwell will surely have to pay me before he can get it.' Q. And the matter of the $3,000 cash payment was discussed? A. No, sir; I told them $4,000. I told them if they would give me $4,000 for my share, they could settle with Tidgwell, but I would tell Tidgwell what I got for my part, and that, if they could put in any cheap stuff for him, that was for him, and not for me."

Touching the assignment of the judgments, he said that that was a private deal between him and the plaintiff; that he had some agreement that, in the event that this suit went

in favor of the plaintiff, and the court ordered it, he would reassign the judgments. He further testified that he had a conversation with Bouma, in which Bouma offered to deed the land in question to the plaintiff; that he said that he would deed it to the plaintiff if the plaintiff would agree not to prosecute him criminally; that he said to Bouma:

"That is all Tidgwell is asking of you in the suit now filed, that you return to him a deed for the Howard County farm and the rents of it."

He said that the plaintiff would surely not refuse this offer to deed the land if Bouma could make it appear that he had no other property, neither he nor his wife. He says that Bouma told him that the deed was already made out in blank and in a safe at Lynville; that in the conversation he told Bouma to go and get the deed and make an affidavit that he had no other property, and to come back on the next day and bring the deed; that he would take the deed to Tidgwell and try to bring about this settlement, only that Mr. Tidgwell cannot and dare not promise in any way that he would not prosecute him criminally. He says that he left the matter right there and went home, expecting Bouma back the next day; that Bouma never came, and that was the last conference that he had with him. He further testified that Bouma, in this conversation, told him that it was a crooked deal that he had worked on Tidgwell.

Bouma testifies that no such conspiracy was entered into as detailed by Rietveld; claims that the general public considered Rietveld to be a wealthy man; that he also believed it; that he had no knowledge of Rietveld's insolvency; that he gave Rietveld a consideration for these notes; that he had never seen the land; that it was represented to him by Rietveld to be ample security for the notes; denies that he ever told plaintiff that Rietveld was worth any considerable sum of money; testifies that he told him that he was a banker and reputed to be worth so much money; that he gave him the description of the land and told him that he knew nothing

of it personally; that this was a description given to him by Rietveld; that he urged the plaintiff to investigate for himself; that plaintiff did investigate before this deal was entered into; that they had prior dealings in which these notes were involved; that, prior to this time, the plaintiff had seen these notes and these mortgages, and his attention was called to the securities.

E. B. Macy testifies:

"I am 48 years of age; live at Lynville; am in the lumber and grain business; have an interest in the bank. In the year 1906, was in a general banking business, grain and lumber business."

He said that he was connected with the Exchange Bank; that he was cashier of the bank; that he had been in that bank since 1904; that he was acquainted with Bouma; that he met the plaintiff about December 19, 1906. Plaintiff called at his bank on account of a deal which was being transacted through the bank between Bouma and other parties. He said also that he had a talk with Tidgwell at the bank; that Mr. Tidgwell inquired with relation to the financial standing of Mr. Rietveld; that he told him that he regarded him worth from $75,000 to $80,000; that that was his opinion at the time. He further testified:

"All I can say is that Mr. Rietveld was worth about $75,000 at that time, and it is still my opinion that he was. I formed that opinion by several years' reputation he had in our neighborhood. I got that opinion and I believe it was right."

The transaction involved in this suit was had in March, 1907. Up to the year 1910, Rietveld was still running the bank with which he was connected at the time that the trade was made. For nearly three years after the trade, he continued in the banking business and other lines of activity in Pella. He had bought and sold considerable quantities of real estate in Iowa and in other places during this time. About the beginning of the year 1910, or the latter part of the year

1909, he suddenly claimed and appeared to be insolvent, and went out of business entirely, so far as that section of the country was concerned.

Tidgwell testifies that he came to the conclusion that the notes were worthless in the year 1909, and that they could not be collected. He, however, made no effort to rescind the contract, but made an effort to trade the notes off for other property, or at least made a proposition to do so, and afterwards had Rietveld deed to him the land in Nebraska. Upon this point he testified:

"The deed that I took from Rietveld on the Nebraska land was to apply upon my judgment against him. I made arrangements with him that, if this land fetched me more than the mortgages amounted to, I would give him credit for them on the judgment he owed me."

Nor was any effort made to rescind the contract, nor any claim made by the plaintiff that he had been defrauded, until the 16th of August, 1911, or about the time when this suit was begun.

We have not attempted to set out all the evidence, or even a substantial part of the evidence, but sufficient to show the conflicting claims of the parties, and the nature and character of the testimony which is given in support.

Plaintiff claims that he relied upon a statement made by Bouma that the land described in the mortgage was amply sufficient to secure the amount of the notes; that, from the description of the property given by Bouma, it so appeared to him; and yet he never had the assignment of these mortgages recorded, nor did he make any investigation as to the character of the land, although he knew, nearly three years before he commenced this suit (if his contention is to be followed that the mortgages were worthless as security), that Rietveld was financially irresponsible. His conduct has probative force as tending to negative the claims now made that these representations now relied upon were, in fact, made by Bouma. The land deeded by the plaintiff to Bouma

remained just as it was deeded. This fact was known to the plaintiff, and yet he took no action to rescind, reduced the notes to judgment, and assigned them to Michaels. He took deeds to the mortgaged property, agreeing to credit Rietveld on the judgment with the amount realized therefrom. The evidence leaves it in doubt whether or not Rietveld was insolvent at the time these notes were transferred. That he had some property, we are satisfied from the whole record, although he denies it. If we accept Michaels' and Rietveld's testimony as a verity, we would have no trouble in ascertaining that a legal fraud had been practiced upon the plaintiff, but the whole record does not justify us in accepting this as true.

The burden is on the plaintiff to establish his case. Fraud is never presumed. It must be shown by clear and satisfactory evidence. That the plaintiff got the worst of the deal does not argue fraud. These men were dealing at arm's length. If we accept defendant's testimony, it appears, not only that the plaintiff was urged to an investigation of these securities before he purchased them, but that he actually did make an investigation, and he is reported to have said that he was satisfied with his investigation; that he cared nothing for the mortgaged property, because he considered Rietveld amply good for the notes.

With this uncertain and confusing state of the record touching the truth or falsity of the ultimate fact sought to be proved, we turn our attention to what we consider a controlling factor in this case, and one that must, in and of itself, dispose of plaintiff's contention here, and of his right to have this transaction set aside. The plaintiff is asking the right of rescission to undo a transaction that has stood for four and a half years as unquestioned. Two and a half years of that time elapsed after he had full knowledge of the character and value of the property that he received in the transaction, and of the circumstances under which he received

1. VENDOR AND PURCHASER: rescission: laches.

it. During this time, he dealt with the property received as his own.

It is elementary that a party defrauded must act diligently. When he has knowledge of the facts upon which he bases his right to rescind, it is his duty, in law and good conscience, to notify the other party of his intention to rescind within a reasonable time. The rule that a party must rescind within a reasonable time after the discovery of the alleged fraud is well settled in this state, and is the uniform holding, not only of courts of law, but of courts of chancery. Courts have even gone so far as to say that, where the means of the knowledge lies within the reach of the party who seeks rescission, and he negligently fails to avail himself of the means of knowledge thus afforded him, he cannot extend the time for rescission by such negligent conduct. Under such circumstances, he will not be heard to say that he did not in fact know, until the time the suit was begun, or that the suit was begun within a reasonable time after he acquired actual knowledge. The rule is a general one and of uniform application. It has its foundation in the very equity of the matter. It rests upon the thought that one who has received from another property of any value and desires to rescind the contract under which he received it must, within a reasonable time, make his election to rescind, and place, or offer to place, the other party as nearly as possible, in the same position in which he would have been if the deal had not been made; or, in other words, it has been said, in *State Bank of Iowa Falls v. Brown*, 142 Iowa 190, 198:

"It is an universal rule that, where one is induced to purchase property by fraud and deceit, he must, within a reasonable time after discovering the fraud, rescind the contract, and place the other party *in statu quo*. In other words, he has an election, after discovering the fraud, or after the means of knowledge are at hand, to treat the contract as valid, or to rescind, and, if he fails to act promptly and to

rescind, he will be held to have waived his right to do so,''
citing *Moore v. Howe,* 115 Iowa 62.

In the last case, it was said:

''We have no hesitancy in saying, as a matter of law,
that the retention of a retail stock of goods, and sale therefrom
in the ordinary course of business, and appropriating the pro-
ceeds thereof, for nearly four months after acquiring knowl-
edge of the alleged fraud, will preclude a subsequent rescis-
sion of the contract. Such treatment of the property is an
unequivocal election to accept the goods and carry out the
contract. Taking any benefit or changing the condition of the
property bought after learning of the fraud has been adjudged
a waiver of the right to rescind.''

See *German Sav. Bank v. Des Moines Nat'l. Bank,* 122
Iowa 737, in which it is said:

'' 'A party seeking relief on the ground of fraud must
aver and show that he used diligence to detect it, and, if he
had the means of discovery in his power, he will be held to
have known it.' . . . The rule that a party must rescind
within a reasonable time after the discovery of the fraud is
equally well established. . . . We conclude that as the
remedy was not sought within a reasonable time after the
fraud alleged ought to have been ascertained, and as the
plaintiff has continuously treated the notes as its own, it
ought not to be permitted at this late day to rescind and
recover the amount paid.''

The following cases support the above propositions:
*Stetson v. Northern Investment Co.,* 104 Iowa 393; *Barnes v.
Century Savings Bank,* 165 Iowa 141; *Evans v. Montgomery,*
50 Iowa 325; *Blackman v. Wright,* 96 Iowa 541; *Himes v.
Langley,* 85 Ind. 77. In the last case, it is said:

''After a party has become aware of his right to rescind
a contract for fraud, he cannot continue to claim property
acquired under the contract, as his own, and to exercise acts
of ownership over it, without forfeiting his right of rescission.''

See *Clampitt v. Doyle* (N. J.), 70 Atl. 129; *Capital*

*Security Co. v. Holland* (Ala.), 60 So. 495; *Trauzettel v. Kjellman* (Tex. Civ. App.), 163 S. W. 689, 691; *Marshall v. Gilman*, 47 Minn. 131 (49 N. W. 688); *Skinner v. Scott* (Okla.), 118 Pac. 394; *McCoy v. Prince* (Ala.), 66 So. 950. The last case was an action based upon fraudulent representations in which the plaintiff asked a rescission of the contract and the return of the purchase price. The court said:

"If, after the discovery of the fraud or breach of warranty entitling him to rescind, the purchaser uses and deals with the property as his own, or does other acts inconsistent with his right to rescind, then he is held to have elected · to ratify the contract and to have waived his right to rescind; . . . and, in such event, the only remedy left him for the redress of the wrong of the seller is either a suit against such seller for damages (*ex delicto* if there was fraud or deceit, and *ex contractu* if there was merely a breach of warranty); . . . or, if sued by the seller for the purchase price, an abatement *pro tanto* of the recovery by a plea of recoupment or counterclaim."

See *Shappirio v. Goldberg*, 192 U. S. 232 (48 L. Ed. 419). In this case, Judge Day, speaking for the Supreme Court, said:

"It is well settled by repeated decisions of this court that, where a party desires to rescind upon the ground of misrepresentation or fraud, he must upon the discovery of the fraud announce his purpose and adhere to it. If he continues to treat the property as his own the right of rescission is gone, and the party will be held bound by the contract. [Citing authorities.] In other words, when a party discovers that he has been deceived in a transaction of this character he may resort to an action at law to recover damages, or he may have the transaction set aside in which he has been wronged, by the rescission of the contract. If he choose the latter remedy, he must act promptly, 'announce his purpose and adhere to it,' and not by acts of ownership continue to assert right and title over the property as though it belonged to him. . . . It may be that the mere lapse of time in this

case would not of itself have defeated the right to rescind, as a purchaser has a reasonable time in which to make election of such remedy, after discovery of the fraud [citing authorities], but he cannot after such discovery treat the property as his own and exercise acts of ownership over it which show an election to regard the same as still his and at the same time preserve his right of rescission.''

These authorities are the expression of the almost universal holding of the courts of this country upon this question, and we think they are conclusive upon plaintiff's rights to. rescind on the record made here.

It is contended, however, that equity will grant relief, sometimes, in an exercise of its broad equitable power, when it is made to appear that the delay or conduct of the party relied upon as a waiver of the right to rescind

2. CONTRACTS: rescission: rescission in spite of laches: conditions.

did not injuriously affect the other party, and the court can so frame its decree as to protect the other party in granting the rights prayed for. Reliance is had in a measure upon what is said by this court in *Curtis v. Armagast,* 158 Iowa 507, 518.

The record, however, does not place the plaintiff in a position to insist upon this rule. It is the merest speculation upon this record as to what position the parties would have been in had the plaintiff acted promptly and rescinded his contract within a reasonable time after discovering the fraud, and the court is not required, nor is it the duty of the court, to speculate upon the uncertain showing. Under this record, the plaintiff clearly did not exercise the right he here asserts, within a reasonable time after discovering the fraud of which he complains, if any. It therefore is incumbent upon him, if he would invoke the equitable power of the court upon the theory suggested, to show plainly to the court that it now lies within the power of the court to so frame its decree that exact justice will be done to both parties; to show to the court that, by a decree formulated upon this record, the court

can place the defendant in the same position that he would have been in had the plaintiff not slept upon his rights.

Further than that, we think that the record in this case is such that it indicates a positive election on the part of the plaintiff not to rescind the contract on the ground of fraud during all the time intervening between the discovery of the fraud and the commencement of this action; that his conduct manifests a purpose and intent on his part to affirm the contract, or, at least, not to insist upon a rescission.

3. VENDOR AND
PURCHASER:
fraud: affirm-
ance: acts of
ownership.

With this state of the record, we are satisfied with the holding of the court below, and the case is therefore—*Affirmed.*

DEEMER, LADD and SALINGER, JJ., concur.