LOUIS WOKOUN, Appellant, v. G. H. JAMESON et al., Appellees.

**VENDOR AND PURCHASER:** False Representations as to Value.
1   Representations as to value, made as statements of fact and to be relied on and to induce a contract, furnish ample basis for a rescission of the contract, if such representations prove to be false.

**VENDOR AND PURCHASER:** Waiver by Laches. Rescission for fraud must be made within a reasonable time after full discovery of the fraud, or the right will be irrevocably lost. So held where, after such full knowledge, the party held the contract and acted thereunder for more than two years, and then, after an abortive assignment of the contract, attempted to rescind.

*Appeal from Black Hawk District Court.*—H. B. Boies, Judge.

·May 20, 1918.

This is an action in equity, by which plaintiff seeks to rescind a contract and to set aside and cancel 140 promissory notes, aggregating the sum of $14,000, of which, 128 notes were given by plaintiff to defendant G. H. Jameson, and 12 notes were given to E. J. Hanna, as part payment in the purchase of 35 vacant town lots in the city of Waterloo; and to recover the sum of $10,000, advanced payments made in said purchase, and interest and taxes since paid by plaintiff. Plaintiff claims that the contract under which said notes were given and payments made was procured by defendants W. R. Jameson and W. P. Soash, as agents for G. H. Jameson, and that they conspired together for the purpose of cheating plaintiff. After a trial upon the merits, the trial court dismissed the plaintiff's petition, and plaintiff appeals.—*Affirmed.*

*Reed, Tuthill & Reed* and *Treichler & Treichler,* for appellant.

*J. W. Arbuckle,* for appellees.

Preston, C. J.—Plaintiff resides at Cedar Rapids, and is cashier of a bank there. Prior to the transaction in question, defendant Soash was indebted to plaintiff upon a note in the sum of $8,000 and interest. It is alleged that, about March 13, 1914, defendant Soash requested plaintiff to go to Waterloo, stating that he had a deal on with W. R. Jameson by which the Soash indebtedness to plaintiff could be paid as part consideration in the purchase of town lots in Waterloo; that thereafter, on March 18th, plaintiff went to Waterloo and met Soash and W. R. Jameson, and a schedule was produced, giving the prices of 35 lots in Rose Hill Addition to Waterloo, amounting to $24,125; that they represented

to plaintiff that the prices given in the schedule were the fair market values of said lots; that plaintiff was unacquainted in Waterloo, and had no knowledge or information as to the value of the lots, and relied upon said statements as being true. On that date, the parties entered into what is called a preliminary contract for the purchase of the 35 lots at the price stated, and thereafter, about March 25th, there were substituted separate and distinct contracts for each of the 35 lots. Plaintiff alleges that the consideration for said contracts was the cancellation of the Soash $8,000 note and interest, a deed to 7 lots in Texas, valued at $300, cash paid W. R. Jameson, $200, and the execution of the 140 promissory notes; that plaintiff afterwards paid W. R. Jameson, as interest and taxes, the sum of $772.90, making a total cash payment to W. R. of $972.90; that plaintiff had confidence in the integrity of W. R. Jameson, with whom he had an acquaintance; that, prior to November 20, 1914, W. R. Jameson assured plaintiff that the lots had advanced in value, and advised plaintiff not to offer the same for sale; that, on November 20, 1914, plaintiff assigned said contracts, through the defendant Soash, to Farmers Land & Cattle Company, of St. Paul, as part consideration for the purchase of land in Wisconsin; and that plaintiff did not discover that defendant's representations as to the value of the lots were false until March 11, 1916, when the Cattle Company refused to carry out their contract and release plaintiff from the payment of said notes, stating that, upon investigation, they found that the lots were not worth the amount of the notes.

The execution of the contracts is admitted, and it is admitted that Soash and W. R. Jameson were the agents for G. H. Jameson. The consideration for the notes is shown to be as claimed. Defendants aver that defendant Soash was discharged in bankruptcy, and the plaintiff's claim against him was of no value. It appears that such is the fact, and that plaintiff had notice of the bankruptcy pro-

ceedings, and filed his $8,000 claim therein. Plaintiff says, as to this, that Soash afterwards admitted the debt. For further answer, defendants aver that, for more than two years after the making of the contracts and the execution of the notes referred to in the petition, the plaintiff, with full knowledge of every fact and circumstance relied upon by him, or which he may rely upon as a basis for his cause of action, and with full knowledge of the value of the property which he alleges to have been misrepresented to him, continued to hold said contracts and to negotiate for a sale and assignment thereof, and for a sale of the property covered thereby; that, with such knowledge, he paid, or caused to be paid, the interest on said notes and the taxes on the real estate, and continued to exercise full ownership of and control over said property, and to have, during all said period, the privilege and opportunity incident to such exercise of ownership and control for the sale or other profitable disposition thereof, and actually sold and assigned said contracts, in exchange for other property; and that, by reason thereof, he has waived any right which he might or could have had to rescind said contracts, or for the cancellation of said notes. It appears that, after Mr. Soash went into bankruptcy, he undertook to and did settle many of his discharged obligations by negotiating the sale of real estate to his creditors at retail prices, which he was able to procure at wholesale prices, the difference between these prices being applied toward the liquidation of his claim, the creditors assuming the payment of that portion of the purchase price going to the original vendor. Plaintiff was one of the parties to whom Soash submitted this kind of a proposition.

Some other circumstances will be referred to later and in more detail, bearing upon the question of waiver.

1. Elaborate arguments have been made by both sides on the point as to whether an expression of opinion as to the value of property will sustain an action for fraud, plaintiff

**1. VENDOR AND PURCHASER: false representation as to value.**

contending that the rule does not apply, where the representation is intended to be taken as a fact and as an inducement to the trade, and where, as here, plaintiff was a resident of another city and not acquainted with the values of property in Waterloo, and did not have an equal opportunity to know the truth. They contend that, in such cases, the false representations as to value constitute a fraud, and are actionable. They say, too, that the fact that the purchaser does not procure the information which ordinary prudence would dictate will not defeat his recovery when the seller has superior knowledge, and the purchaser relies upon the seller's misrepresentations. They cite, on the first proposition, *Van Vliet Fletcher Automobile Co. v. Crowell*, 171 Iowa 64; *Ross v. Bolte*, 165 Iowa 499; *Mattauch v. Walsh Bros.*, 136 Iowa 225; *Hetland v. Bilstad*, 140 Iowa 411; and other cases. See also the recent case of *Rembe v. Ferguson*, 183 Iowa 29. On the second proposition, they cite *Holmes v. Rivers*, 145 Iowa 702, 709; and the *Hetland* case, supra. *Ross v. Bolte*, supra, is cited to the point that, where defendants conspired for the purpose of defrauding plaintiff, and did defraud him, each defendant will be liable for the loss sustained.

Upon the trial, four witnesses testified for plaintiff as to the value of the lots, and their estimates range from about $4,200 to nearly $8,000. A larger number of witnesses testified for defendants, and their estimates range from about $14,000 to $24,000. Defendants contend that the average of all the witnesses, for plaintiff and for defendants, is about $15,000. Plaintiff contends that there are circumstances which lessen the value of the estimates by defendants' witnesses. We are inclined to the view that, under the circumstances shown by the record, the representations were made substantially as alleged by plaintiff, and that, under our cases, they are actionable. We shall not, however, go into

this question further, for the reason that we are of opinion that the case turns on the question of waiver.

2. Under the record, we are satisfied that plaintiff has waived his right to rescind, because he did not do so promptly after discovering the fraud, or after the means of knowledge were at hand. It appears that, within a few days after these contracts and notes were executed, there were further negotiations between these parties for the purchase by plaintiff of other lots in the same addition and of about the same quality and value, to be paid for, in part, by taking into account an obligation of Soash for $1,000 on a note given to one Johnson. Pending these negotiations, plaintiff made an entirely independent investigation of the Rose Hill lots and their value, free from any interference by defendants; and, appellees contend that such investigation was unknown to them, and that it was only developed at the trial upon cross-examination of plaintiff himself. We shall not set out all the evidence bearing on this, but plaintiff himself testified on this matter:

"After the deal was made, and prior to April 18, 1914, I was making an investigation of an additional bunch of lots offered me on the Texas deal. They were practically the same lots as those I had already bought. They lay in the same addition, and some, perhaps, adjacent to those that I had already bought; and I was making an investigation with reference to those lots under the proposed Texas deal, or in the Johnson deal, and I concluded, as a result of my investigation, that they would be all right at $100 per lot less than they were being offered for. I wrote here to different parties. I don't recall who, without looking at my files. I think I wrote to real estate men here in Waterloo about these lots on Rose Hill and about the value of them. I must have got replies expressing their opinions as to the value of the lots. I don't recall how many such letters I wrote and

how many such answers I received. It is just possible I
made a trip here, too. The fact is that I inquired of some of
the banks, and they said, well, it was a new addition. They
were not in a position to say just what those lots would sell
for, but they thought that those prices were high. I had
a price list for the whole addition, and submitted it to them.
I think it was the same price list as the one I had seen and
used in connection with my deal with Mr. Jameson, and
that I afterwards sent to the Farmers Land & Cattle Com-
pany. In making inquiry about those lots, I think I visited
the Leavitt & Johnson Trust Company and the Security Sav-
ings Bank, I asked them about the values of these lots.
They said they did not know; that it was a new addition;
that it was hard to place a value on it, but they did not have
occasion to make any loans there. I think it was there at
that bank where the party with whom I discussed the mat-
ter expressed the opinion that the prices were high. I had
submitted to the banker this price list. This same opinion
was expressed by people at the Leavitt & Johnson Trust
Company. I think I inquired of another real estate man,
but he was not posted,—the Gardner Land Company. I
went out and looked at the lots again, when I was there, and
looked the addition over, and it was after I had made that
trip and after I had received these letters from real estate
men in Waterloo that I expressed the opinion that the price
was too high, after deducting $100. I should imagine I
wrote to two or three different people. I don't think I got
answers to all of my letters. I think I got two answers. In
these letters that I received in reply, they expressed the
thought at that time that the prices were high; so that, in
less than a month after I made this deal with Mr. G. H.
Jameson for the purchase of these 35 lots, I had all the in-
formation I could find out by writing letters to real estate
men here, and by inquiring of bankers with reference to

these Rose Hill lots,—enough information to turn down the proposition that they made at the time."

From this it appears, as stated, that plaintiff made the investigation, and that it was his own opinion, at that time, nearly two years before any attempted rescission, that the prices of the lots were too high, by $100 a lot; and he says that, a month after he made this deal with defendants for the 35 lots in controversy, he had all the information he could find out by writing letters to real estate men and bankers; and that he again visited the property, and refused to take the additional lots. On April 18, 1914, plaintiff wrote Soash on the subject, and, among other things, says that:

"According to information which I have been able to obtain, the lots would be quite high even if $100 was cut off on each lot."

This has reference, as we understand it, to the proposed purchase of additional lots. Plaintiff again wrote Soash, on April 22, 1914, to substantially the same effect. After such investigation, he made no complaint, although he had the opportunity when he wrote these letters, and he commenced no suit, but continued to hold the contracts and to exercise such ownership and control of the lots as the contracts gave him.

About November 1, 1914, plaintiff entered into negotiations with the Farmers Land & Cattle Company, which resulted in a contract in that month between them, under which plaintiff turned in his equity in these lots at $14,000, on a trade for 12,000 acres of Wisconsin land, and plaintiff made the necessary assignment of the contracts in question. Plaintiff took the Wisconsin land at $12 per acre in this trade; and, up to the time of the trial, he had sold 1,000 acres for $15,000, on a cash basis. There is but little evidence in the record as to the value of the remaining 11,000 acres; but plaintiff testified, and his counsel claims it is the

only evidence in the record on that question, that the balance of the Wisconsin land was worth $2 an acre more than he **paid.** Counsel for appellant argue that it should be taken into account that plaintiff may lose on the remaining land; but we do not understand that there is any evidence of that. In taking from plaintiff the assignment of the contracts in suit, the Cattle Company did not assume their payment, and, after an investigation by them, they did not desire to pay off the notes and take the lots, and so notified plaintiff. The Cattle Company then assigned the contracts back to plaintiff for $25; but, under the record as we understand it, the plaintiff still has the Wisconsin land. It is true, as claimed by appellant, that Soash received a commission from the Cattle Company in the trade of the Wisconsin land to plaintiff. It is also said by appellant that this trade was negotiated by Soash, who is a defendant; but we are unable to see that it makes any difference whether it was negotiated by Soash or by somebody else.

It is not claimed by appellant in argument that Soash is solvent, or that the $8,000 note is collectable. Plaintiff is asking to recover a money judgment for this Soash note and the other payments made by him. Appellees contend that plaintiff has been able to recoup his Soash loss and make a nice profit besides, and that he then proposed that defendants take back the lots and give plaintiff back his notes.

After plaintiff made the trade with the Cattle Company, he paid taxes on the lots and interest on the notes given by him, in accordance with his contract with the Cattle Company, and the Cattle Company continued, for nearly a year and a half, in entire control of the lot contracts; and during this time, it was beyond the power of plaintiff to restore to defendants the property acquired of them, had he wished to do so; and this was after plaintiff had made his investigation in April, 1914, as testified to by him, and as before set

out. It should be said that plaintiff claims that he did not know that the value of the lots purchased by him had been misrepresented until after the Cattle Company had refused to pay out on the lots. This suit was brought on May 5, 1916.

There may be other circumstances; but, after reading the record, we are satisfied that, under the law, plaintiff had waived his right to rescind. It is said in *State Bank of Iowa Falls v. Brown,* 142 Iowa 190:

"It is an universal rule that, where one is induced to purchase property by fraud and deceit, he must, within a reasonable time after discovering the fraud, rescind the contract and place the other party *in statu quo.* In other words, he has an election, after discovering the fraud, or after the means of knowledge are at hand, to treat the contract as valid or to rescind, and if he fails to act promptly and to rescind, he will be held to have waived his right to do so." See, also, *Barnes v. Century Sav. Bank,* 165 Iowa 141, 174; *Tidgwell v. Bouma,* 176 Iowa 47, 59; *German Sav. Bank v. Des Moines National Bank,* 122 Iowa 737; and *Moore v. Howe,* 115 Iowa 62. In the last-named case, it was held, as a matter of law, that the retention of a retail stock of goods, and sale therefrom in the ordinary course of business, and appropriating the proceeds thereof for four months after acquiring knowledge of the alleged fraud, preclude a subsequent rescission of the contract, and in that case it was said:

"Such treatment of the property is an unequivocal election to accept the goods and carry out the contract. Taking any benefit or changing the condition of the property bought, after learning of the fraud, has been adjudged a waiver of the right to rescind."

In 9 Cyc. 436, it is said:

"The party defrauded will generally lose his right to rescind if he takes any benefit under the contract or does

any other act which implies an intention to abide by it or an affirmation of it, after he has become aware of the fraud."

In 10 R. C. L. 395, the text reads:

"It is a familiar doctrine that, apart from any question of statutory limitation, courts of equity will discourage laches and delay in the enforcement of rights. The general principle is that nothing can call forth the court of chancery into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive and does nothing. * * * Its object is, in general, to exact of the complainant fair dealing with his adversary; and the rule was adopted largely because, after great lapse of time, from death of parties, loss of papers, death of witnesses, change of title, intervention of equities, or other causes, there is danger of doing injustice, and there can be no longer a safe determination of the controversy."

3. It is thought by appellant that, even though Soash had been discharged in bankruptcy, he thereafter, in writing, by letter, admitted the debt to plaintiff on the $8,000 note. Cases are cited by both parties pro and con on this proposition. But, in view of our holding on the question of waiver, it is not necessary to determine this point.

On the entire record, we are of opinion that the decree of the trial court is right, and it is, therefore,—*Affirmed.*

WEAVER, GAYNOR, and STEVENS, JJ., concur.