TRAUZETTEL et al. v. KJELLMAN et ux.

(Court of Civil Appeals of Texas. San Antonio. Jan. 7, 1914. On Motion for Rehearing, Feb. 25, 1914.)

1. EXCHANGE OF PROPERTY (§ 5*)—RESCISSION—RIGHT TO RESCIND.

Plaintiff exchanged Texas lands for California lands belonging to defendant. After discovering defendant's fraud and misrepresentations with regard to his land, plaintiff mortgaged it, and upon mortgage foreclosure, the mortgagee bought it in. This was done before plaintiff discovered that his Texas lands had been conveyed to a bona fide holder. While plaintiff claimed that the purchaser would reconvey the California lands in event of a judgment of rescission, no tender of the deed was made. *Held*, that plaintiff by treating the California property as his own after he had discovered the fraud, made an election and could not thereafter rescind his contract.

[Ed. Note.—For other cases, see Exchange of Property, Cent. Dig. §§ 5, 6, 8–10; Dec. Dig. § 5.*]

On Motion for Rehearing.

2. EXCHANGE OF PROPERTY (§ 8*)—CONTRACTS—RESCISSION—EVIDENCE.

In a suit for the rescission of an exchange of land, evidence *held* to show that plaintiff treated the property, which he acquired by the exchange, as his own before he knew that the land which he parted with had been conveyed to a bona fide purchaser.

[Ed. Note.—For other cases, see Exchange of Property, Cent. Dig. §§ 14–18; Dec. Dig. § 8.*]

Appeal from District Court, Calhoun County; Jno. M. Green, Judge.

Suit by William Kjellman and wife against G. O. Trauzettel and others. From a judgment for plaintiff, defendants appeal. Reversed and rendered.

Davidson & Bailey, of Cuero, and Templeton, Brooks, Napier & Ogden, all of San Antonio, for appellants. Proctor, Vandenberge & Crain, of Victoria, for appellees.

CARL, J. Appellees Wm. A. Kjellman and Oline Kjellman, his wife, filed this suit to rescind a sale and to cancel a deed dated October 10, 1910, made by them to appellant G. O. Trauzettel, for 102 acres of land in Calhoun county, Tex., being a part of the A. Esparza grant and herein referred to as Noble's Point. This property was conveyed to Trauzettel for a section of land in Riverside county, Cal., being section No. 19 in township No. 2, range No. 1 west, San Bernardino Base Meridian, and containing 672.72 acres of land; and for the western one-half of farm lot No. 391 of the subdivision of lands belonging to the Semi-Tropic Land & Water Company, in San Bernardino county, Cal., containing 12 acres of land on which was an orange and an olive grove. This latter is known as the "Colton farm." The petition charged that fraud was practiced on him, in that Trauzettel pointed out the wrong boundaries to section 19, representing to him that it contained tillable land which it did not contain, and also that it had certain water supplies for irrigation which it did not have; that it had valuable greasewood timber which was not found there on examination; and that the amount of incumbrances exceeded what it was represented were against the land. It further alleged misrepresentations by Trauzettel as to the orange and olive grove on the 12-acre Colton farm, and the water rights in connection therewith. The petition further charges that Trauzettel and J. D. Clayton conspired together to defraud the plaintiff, and that the intervener, the Mortgage Securities Company, was really the defendant John D. Clayton. There was an alternative prayer for $19,500 damages in the event rescission was not granted, composed of (1) $5,000 excess incumbrance on the California property, (2) $4,500 excess valuation on Colton orange grove, and (3) $10,000 excess valuation on section No. 19, and prayed that these amounts be fixed as vendor's lien on the Noble's Point property in Calhoun county. This alternative prayer was abandoned on the trial.

The Mortgage Securities Company, a corporation of Los Angeles, Cal., was permitted to intervene in the case, and the defendants Trauzettel and Clayton, joining therein, entered general demurrer, general denial, and plea of not guilty. The defendants Clayton and the Mortgage Securities Company specially denied that they perpetrated any fraud on plaintiff, or had any notice of fraud being perpetrated on him. And further they set up a note for the sum of $8,000, dated October 24, 1910, signed by G. O. Trauzettel and his wife, due 90 days after date, payable to the order of John D. Clayton, who, it was alleged, was merely trustee for the Mortgage Securities Company, and secured by a deed of the Noble's Point property above referred to; the answer setting forth that an absolute deed on its face for this property made by G. O. Trauzettel and wife to him was in fact a trust to secure said note, and foreclosure of the lien was asked. Clayton and the Mortgage Securities Company set forth that when plaintiff Kjellman and Trauzettel began negotiations for the exchange of their respective properties, the Mortgage Securities Company held a lien on Trauzettel's California property, in the sum of $8,000; that such sum had been advanced to Trauzettel by the company for the purpose of taking up liens on section 19 in Riverside county, Cal.; and that plaintiff knew of the same and requested such shifting of the lien from the California property to Noble's Point property, so that section 19 might thereby be relieved of that debt. The intervener Mortgage Securities Company asked for judgment against the defendant Trauzettel for the amount of said note and certain other amounts shown to have been advanced,

and for foreclosure of the lien on the Noble's Point property. It might also be added that the plaintiff in his pleadings tendered a reconveyance of the California property, but this was a mere offer; no deed having been tendered.

The case was tried by the court without a jury, and judgment was rendered for plaintiffs against all defendants for title and possession of the Noble's Point property and for cancellation of the deed made by Kjellman to Trauzettel, as well as the deed made from Trauzettel to Clayton and from A. B. Carlisle to Clayton. The judgment further undertook to estop plaintiffs Kjellman and wife from asserting any interest in the California property, and gave the Mortgage Securities Company judgment against the defendant Trauzettel, but refused to establish a lien on the Noble's Point land to secure same. The court filed conclusions of law and facts, to which findings exceptions were duly reserved. This is a sufficient statement of the case for the present, as the evidence will be more fully developed in the discussion of the various assignments.

In July, 1910, appellee Kjellman and his wife went from Port Lavaca, Tex., to Los Angeles, Cal., "prospecting" with a view of staying there if they liked it and could make suitable disposition of their Texas property. At Los Angeles they discovered an advertisement which brought them in touch with appellant Trauzettel who was in a receptive mood for Texas property on an exchange basis. After considerable correspondence and some personal interviews, Kjellman went out with Trauzettel to look over the California properties, and Trauzettel showed him the good points and, Kjellman claims, left out the bad points. The result was that Kjellman became satisfied to make a deal, his understanding at that time being that Trauzettel's property was incumbered for $8,120. This was in October, 1910. Trauzettel had not inspected the Texas property, and therefore took an option subject to inspection. Kjellman and wife made their deed and put it with John D. Clayton to be delivered to Trauzettel when Clayton should furnish certificates of the title company as to the California property showing title in him subject to $8,120 to be assumed by appellee. An escrow agreement to this effect was signed by Kjellman, but subsequently was amended when it was discovered that there was $8,920 against the property, so as to cover that sum. On November 2, 1910, the deed from Kjellman to Trauzettel and from Trauzettel to Clayton conveying the Texas property were placed of record in Calhoun county, Tex., and on November 15, 1910, the deeds from Trauzettel and wife to Kjellman for the California property were placed of record. On December 28, 1910, appellee called at Clayton's office and got the title certificates and other papers together with a bill from Clayton for his services and expenses incurred in the transaction. In this bill was an item for the recording of Kjellman's deeds for the California property. This bill was for about $22 altogether. He paid the bill.

[1] The first assignment of error complains that the court erred in rendering judgment for rescission of the contract of sale from Kjellman to Trauzettel and the cancellation of this deed for the 102 acres of land, since this is a suit in equity in which the plaintiffs seek equitable relief, and in which they are first required to do equity, and, having offered to convey back to Trauzettel and the Mortgage Securities Company the California property, it becomes their duty to do so, etc. This court agrees with appellant's contention, and therefore this assignment is sustained.

The trial court finds that Kjellman, on December 30, 1910, had discovered that the incumbrances were $1,200 in excess of $8,920, the amount he was to assume; and that he thereupon instructed his attorney to file suit in Calhoun county, Tex., and he says that he knew then he had been defrauded. His attorney did file suit in cause No. 1,635 in the district court of Calhoun county, and in that suit he alleged a violation of the escrow agreement, made both Trauzettel and Clayton parties defendant, and alleged the transfer from Trauzettel to Clayton, and sought to fix the $1,200 excess indebtedness as a lien on the Noble's Point property. After he got his papers, December 28, 1910, he says he wrote the creditors and "I got replies in about a week, or something like that. It took me up to the 5th of January. After I had gotten replies as to the amount of back taxes, interest, etc., due on this property, I went to Clayton's office and tendered the documents back to him and made demand on him for my deed. That was January 5, 1911. I told him that the incumbrances were more than had been agreed upon, and demanded back my deed to the Calhoun county property. He told me he had put it of record in Calhoun county, November 2, 1910." He says further that he went to see the orange grove October 13, 1910, and then he told Trauzettel he did not consider it what he had claimed for it. He then learned about the water rights. A minister on the train had told him about the water contracts being assessable, about October 17, 1910. He found out in February, 1911, all the facts he claims to have discovered about the orange grove and false representations in regard thereto. He had discovered all the fraud he claims was practiced on him by February 1, 1911, except as to the location of section 19. On February 7, 1911, he went on this land to have it surveyed and locate the corners, and learned of the misrepresentations, he says, Trauzettel had made. A survey was made of this section, February 8, 1911, and he thereupon wired his attorney at Port Lavaca,

Tex., to demand $4,000 additional to his claim by reason of these alleged misrepresentations. His suit was then pending, and he continued to prosecute this suit for damages until November 3, 1911, when a nonsuit was forced upon him. He and his wife borrowed $3,000 and secured it by a mortgage on section 19, on July 20, 1911, in favor of Spring (or Springer). He says he called Spring's attention to the $8,920 already against the property which he had assumed, and then borrowed $3,000 in addition on this quarter. Not only this, he bought the Galli and Wilson mortgages on the property. He got these notes, kept them awhile, and then sold them and got the money for them; and Springer foreclosed on them. He has put it beyond his power to return what he got. He has borrowed money on the land, which has not been paid, and permitted his friend, Spring, to buy in the land. He has dealt with this property as his own, after he has discovered all of the alleged fraud. His election has been made, and at this late date a court of equity will not permit him to have a rescission of the contract. It is not sufficient to say that there was no equity in the property and therefore nothing to return. That is a matter of opinion, and in appellee's opinion there were hundreds of acres of satsuma oranges being grown profitably at Noble's Point. The other man was entitled to have returned what he gave, whether it was worth anything or not. It may be that Trauzettel spread the pallets, but Kjellman has selected his and must lie on it. The law governing a transaction of this kind is clearly stated by Judge Stayton in Allyn & Co. v. Willis & Bro., 65 Tex. 71, as follows: "Speaking of cases in which the owner of goods has been induced to make a sale by fraud of the vendee, the rule is thus stated: 'This contract is voidable at the election of the vendor, not void ab initio. It follows therefore that the vendor may affirm it, or may rescind it. He may sue in assumpsit for the price, and this affirms the contract, or he may sue in trover for the goods or their value, and this disaffirms it.' Benj. Sales, 433, and authorities cited. We therefore conclude that the appellees had such notice of the fraud, through which they were entitled to rescind the sale to Ewing, at the time they instituted their action against him to recover the value of the goods, as to make their act in bringing that action a bar to their right afterwards to rescind the contract of sale. The two actions are inconsistent." This doctrine is approved and again well stated in Wachsmuth et al. v. Sims et al., 32 S. W. 822.

Appellees prosecuted their first suit up till November, 1911, a period long after the last fraud is claimed to have been discovered in February of that year, and after a part of the California property had been mortgaged by them to Springer on July 20, 1911, to secure the payment of a $3,000 loan. Springer foreclosed and brought in the property.

Kjellman had bought in the Galli and Wilson mortgages and then sold them to Springer. Appellee has so dealt with the property in California as to put it beyond his power to return it as he received it, and to rescind he must do this. Gibson v. Lancaster, 90 Tex. 540, 39 S. W. 1078; Aultman v. York, 71 Tex. 261, 9 S. W. 127.

The disposition we have made of the first assignment of error will likewise dispose of the second and third assignments.

It further appears from the undisputed evidence that the deed made by G. O. Trauzettel and Georgia Trauzettel, his wife, to John D. Clayton, was in fact a mortgage or trust deed for the purpose of securing Trauzettel's note dated October 24, 1910, for the sum of $8,000, due John D. Clayton or order 90 days after its date at 8 per cent. per annum interest, and that this note and security were assigned to the Mortgage Securities Company, and that the note also provides for the payment of expenses incurred and for attorney's fees. The intervener, Mortgage Securities Company, is entitled to have judgment for said debt against G. O. Trauzettel and to have the deed, made from Trauzettel and wife to John D. Clayton, declared a mortgage or trust lien to secure said indebtedness and to have the same foreclosed against the Calhoun county, Tex., land, and the same ordered sold as under execution to satisfy said debt.

It is therefore the order of this court that the judgment of the district court of Calhoun county be and the same is hereby in all things reversed, and judgment is here rendered:

1. That plaintiffs below take nothing by reason of this suit.

2. That intervener, the Mortgage Securities Company, a California corporation, have judgment against G. O. Trauzettel for the sum of $8,000, principal due upon said note, together with 8 per cent. interest per annum thereon from October 24, 1910, until paid, and 10 per cent. of the amount of principal and interest due April 21, 1913, as attorney's fees; and for the further sum of $1,215.68 expenses incurred together with 8 per cent. interest thereon per annum from November 1, 1912, until paid.

3. And that the deed made by G. O. and Georgia A. Trauzettel to John D. Clayton for the Noble's Point property in Calhoun county, Tex., be declared a trust or mortgage on said land for the purpose of securing said debt, and such lien be in all things foreclosed, and said Noble's Point property be sold as under execution to satisfy such debt and judgment and costs.

4. The costs of the entire proceedings in this court and the court below are adjudged against the appellees.

Judgment reversed and rendered.

### On Motion for Rehearing.

[2] Appellee has filed an extended motion for rehearing, in which he insists that he did

not deal with the property as his own after he knew all the acts of fraud alleged to have been practiced on him. For instance, he says he did not know that Clayton had a deed reconveying the Noble's Point property to him until the trial began in April, 1913.

The deed from Clayton and his wife to A. B. Carlisle was dated July 17, 1911, and acknowledged by Clayton the same day, and by his wife on July 25, 1911. In this the Noble's Point property was conveyed, and on the same day Mrs. Clayton acknowledged the deed to Carlisle in Los Angeles, Carlisle executed his reconveyance to Clayton in Hamilton county, Tenn. This is rather rapid work, it is true; but this could not have any bearing on Kjellman in dealing with the California property as his own. He placed the $3,000 mortgage on a part of section 19 on July 20, 1911, three days after Clayton acknowledged his deed to Carlisle and two days before Mrs. Clayton acknowledged that same deed. So at the time Kjellman executed the mortgage he could not have been affected by a belief that Carlisle, an innocent purchaser, had acquired the Noble's Point property, because he did not then know that Clayton had sold it. In fact, Clayton's wife had not acknowledged the deed in California at the time Kjellman put the $3,000 mortgage on section 19. This is a rapid age, as shown by the fact that Carlisle in Tennessee executed a sale to Clayton of property he had, we assume, that morning bought in Los Angeles, Cal. But speedy as these transactions were, we do not believe that Kjellman could have been influenced by an event that did not happen until two days later, unless it be that "coming events cast their shadows before." The Carlisle deed could not have been an excuse for placing the mortgage loan on section 19 and thereby dealing with the property as his own after he knew all of the alleged fraudulent acts. Kjellman says: "When I found out Clayton had deeded my property to another party, I thought I was shut out; that was the way I looked at it." He could not have thought this when he put the $3,000 mortgage on section 19, July 20, 1911, because at that time neither the deed from Clayton to Carlisle nor the one from Carlisle back to Clayton had been executed and were not till July 25, 1911. So Kjellman is in error about being in any way influenced thereby.

So we have seen that Kjellman discovered the last alleged act of fraud February 8, 1911, when he had section 19 surveyed and found, as he says, that it had been misrepresented, and that the good land shown him was not on that section, and that the amount and value of greasewood under the ground was not as represented. July 20th following this, he mortgaged a part of section 19 for $3,000, bought up two other mortgages, and sold them again to Springer, who foreclosed under them and sold the land. He could not have been influenced by the Clayton deed to

Carlisle because it was not finally executed until July 25, 1911, and was not placed of record until subsequent to that time. With all the alleged fraud before him and with full knowledge thereof, he has put the land beyond his reach. True, he says he had an arrangement with the purchaser to convey it if necessary; but the purchaser makes no such offer, and no legal document appears by which he could be compelled to do so. The placing of land beyond his power to return it has destroyed his right to rescission (El Campo Co. v. Texas Supply Co., 147 S. W. 338), unless he had shown a valid excuse to explain his conduct, which he has not done (Geiser Mfg. Co. v. Lunsford, 139 S. W. 64). In the El Campo Case, supra, the pleadings themselves show, on part of the complaining party, that the property had passed beyond the control of the party seeking to rescind. It was held that a rescission could not be had and the Supreme Court denied a writ of error. The court said: "By the pleading, it will be seen that the ownership of the engine and the producer had passed to another, the Water, Light & Power Company of El Campo. By the sale of the engine and the producer, appellant put it out of its power to deliver either thereof to appellee, which, in law, constitutes an election on its part to accept the property and to proceed by some other avenue for its remedy. Kempner v. Advance Thresher Co., 54 Tex. Civ. App. 650, 118 S. W. 714. Nor does the fact that the Water, Light & Power Company of El Campo had rejected the engine and producer after its purchase from appellee, as alleged, change the situation. That concern, it seems, had sued appellant for damages, which appears to be inconsistent with the claim that it also had rejected the engine and producer, and that appellant, for that reason, was prepared to deliver same back to appellee. We understand that 'contracts can only be rescinded where it is possible to put the parties back in their original position and with their original rights. A contract, voidable for fraud, cannot be avoided when the other party cannot be restored to his status quo. If it cannot be rescinded in toto, it cannot be rescinded at all; but the complaining party must resort to an action for damages' (9 Cyc. 437, 438), or, as he may do under our statutes, plead failure of consideration in a suit to recover the purchase money. There may be some variation in the rule; but the pleading in the instant case presents none."

The plaintiff's own pleadings in this case show that Kjellman had mortgaged the property and fail to put him in a position to restore it; and the evidence of plaintiff puts it even further from his power to restore, and he could not therefore recover as was done.

Appellee's very able motion for a rehearing has caused us to go more into detail than we otherwise would have done. But we do not believe that he has shown any right to

rescission of the contract, and therefore adhere to our original opinion, and overrule the motion.