KIEHN v. WILLMANN.    (No. 7760.)

(Court of Civil Appeals of Texas. Galveston. Dec. 4, 1919. Rehearing Denied Jan. 15, 1920.)

1. APPEAL AND ERROR ☞1056(4)—EXCLUSION OF EVIDENCE HARMLESS IN VIEW OF DETERMINATION ON OTHER ISSUE.

In action to set aside conveyance for fraud, exclusion of evidence tending to show that defendant was a swindler, if error, was harmless, where the court found that defendant had made the fraudulent representations but gave defendant judgment on ground of estoppel.

2. VENDOR AND PURCHASER ☞43(1)—PURCHASER WHO ATTEMPTS TO SELL NOTES RECEIVED FOR PROPERTY AFTER DISCOVERY OF FRAUD WAIVES FRAUD.

If plaintiff, after discovering that the vendor's notes transferred to plaintiff by defendant

for plaintiff's property were not good notes and well secured as represented by defendant, tried to sell the notes to third persons, and, as defendant's agent, tried to sell to third persons the land he had conveyed to defendant, he waived the fraud practiced upon him by defendant and ratified the contract.

3. VENDOR AND PURCHASER ☞44—EVIDENCE SUFFICIENT TO SHOW WAIVER OF FRAUD BY VENDOR.

In grantor's action to set aside conveyance and cancel note upon ground of grantee's fraudulent representations as to value and security of vendor's notes given grantor in exchange for property, evidence held to sustain findings that grantor, after discovery of the fraud, tried to sell the notes to third persons and to sell the property as grantee's agent.

4. ACTION ☞25(2)—ACTION ONE IN EQUITY FOR RESCISSION AND NOT AT LAW FOR DAMAGES.

Vendor's petition, alleging that vendor's notes on other land received for the land sold were valueless, held to state a cause of action in equity for rescission and recovery of the property transferred, and not a suit for damages.

5. PLEADING ☞279(4)—SUPPLEMENTAL PETITION SETTING UP NEW MATTER NOT CONSTITUTING A REPLY INSUFFICIENT.

In suit to set aside deed, new matter alleged in supplemental petition attempting to set up claim for damages, but not constituting a reply to any allegations in defendant's answer, under district and county court rule 5 (142 S. W. xvii), was not sufficient to warrant submission of question of damages, since such matter, under rule 15, should have been pleaded by amendment to the petition.

Appeal from District Court, Fayette County; M. C. Jeffrey, Judge.

Action by E. W. Kiehn against R. J. Willmann. Judgment for defendant, and plaintiff appeals. Affirmed.

John T. Duncan, of La Grange, for appellant.

Dibrell & Mosheim, of Sequin, and L. D. Brown, of La Grange, for appellee.

LANE, J. This suit was instituted by E. W. Kiehn, appellant, against the appellee, R. J. Willmann, to set aside a deed of conveyance from appellant to appellee to 161.9 acres of land situated in Fayette county, Tex., and to cancel a certain note for $1,200, executed by appellant and payable to appellee.

The cause of action as alleged by appellant is substantially: That appellee traded appellant three sets of vendor's lien notes, aggregating the sum of $6,600, and some accrued interest, for appellant's tract of 161.9 acres of land, which was valued at $8,850, but was incumbered by an indebtedness of $3,350, the payment of which appellee assumed. For the difference between appellant's equity in the tract of land and the aggregate amount

of appellee's vendor's lien notes, with accrued interest, appellant gave appellee his personal note for $1,200, secured by one set of the vendor's lien notes so traded him by appellee. The notes traded appellant by appellee were secured by the vendor's lien against certain lands and lots situated in Pecos, Dimmitt, and Hardeman counties.

Reduced to the ultimate, the complaint of appellant, as alleged in his original petition, is that the appellee knowingly and willfully, and for the purpose of deceiving and robbing him of his property, fraudulently represented to him that said notes traded to him were good notes, that they were well secured, that the payments recited in the deed retaining the vendor's liens had been made, and that the notes were gilt-edged; but that such representations were false and untrue, and were known to be false by appellee when made; that the security, instead of being good as represented, was practically worthless and grossly inadequate, and that said notes were not good, well-secured, gilt-edged notes, but were practically worthless; but that appellant, believing such representations to be true, relied thereon and was thereby defrauded by appellee of his land and property and induced to execute and deliver to appellee the note for $1,200, and that he has been actually demaged in the sum of $6,500; and, further, that, by reason of the oppression and deceitful misrepresentations of appellee, he demands the sum of $1,000 as punitory damages; that he tenders into court, and to appellee, the notes received by him from appellee, and then prays relief from the court as follows:

"That the deed executed by this plaintiff through and on account of the fraudulent representations of the said defendant on the 31st day of January, 1916, and recorded in volume 101, pp. 50–51, of the Deed Records of Fayette county, shall be canceled, annulled, and held for naught, and the title of said land be divested out of the defendant, R. J. Willmann, and be reinvested in this plaintiff; and, further, that the defendant be commanded to deliver into this court this plaintiff's notes executed in part payment for said notes, and that the same be canceled and annulled and held for naught; and that, if the defendant herein have in any way disposed of said note, then he asks for judgment against the defendant for the amount of said notes, with the same rate of interest which said note bears, and he asks for all such other relief, whether the same be legal or equitable, which he may be entitled to under the facts herein pleaded and proven in this cause, for costs of suit and general relief, for all of which he will ever pray."

Appellee answered by general denial and by special plea in bar of appellant's right of rescission of the contract between the parties, as follows:

"This defendant, R. J. Willmann, further represents and shows to the court that plaintiff is not in a position in this case to invoke the equitable powers of this court, and is estopped from doing so, for the reason that this defendant says that if the securities transferred and assigned by him to plaintiff as alleged in plaintiff's petition are worthless securities, and that said notes were given for land and lots of inferior value and worth far less than the amount of said notes, this defendant charges that such fact became known to plaintiff long before the institution of this suit, and that plaintiff received the information alleged by him to have been received, and whether true or false, such information was believed by plaintiff to be true; and that after plaintiff ascertained that said securities from his point of view were inadequate and worthless this defendant charges that plaintiff, in an endeavor to impose upon others, offered said securities for sale, and endeavored to sell said securities for their face value, and hence defendant says that plaintiff does not come into this court with clean hands, but comes tainted with an effort to commit fraud, and hence is estopped from asking equity of the court; and defendant here now pleads in bar of plaintiff's right to ask that the deed to said land made to this defendant be set aside and held for naught, and that the note executed by plaintiff to this defendant be canceled and held for naught, and asking for a rescission of the entire contract, the principle of estoppel in bar of any right in plaintiff to ask equity in this cause, and by offering said notes for sale said plaintiff has elected to accept said property, and being aware of all the facts relating to said securities he waived the right to the rescission of said contract of sale.

"Defendant further avers that if there was any fraud practiced upon plaintiff as averred, or if there was any reason why said sale should have been rescinded, which defendant does not confess, but denies, then he says that after plaintiff became aware of such and believed same to be true, or after he had information concerning same which put him upon inquiry, which inquiry, if pursued, would have disclosed all facts concerning the property in question, plaintiff, by his own acts, elected to accept the properties passed to him and to treat the properties passed to defendant as being defendant's, and had transactions with defendant concerning same, and waived his right to rescind said sale, if any he had, and is now forever estopped from seeking a rescission of said sale at the hands of this court."

He prayed that his title to the property in controversy be quieted.

By what is styled plaintiff's second supplemental petition, appellant alleged that in his contract with appellee he (appellee) was to pay the accrued interest on the $3,350 note, the payment of which was assumed by appellee; that said accrued interest amounted to $190 or $200; that he paid appellee $167 to pay said accrued interest, and that appellee expended the same for his own use and benefit and did not pay said accrued interest as he had agreed to do; that as no interest had been paid on the note suit was instituted thereon by the holder thereof, and by reason of such suit appellant's liability was increased $250 as attorney's fees; and that by reason of the refusal of appellee to reconvey

to him his land he had been damaged in the further sum of $500. In this supplemental petition he prayed for judgment for the $167 paid by him to appellee for the purpose of paying accrued interest, and for such other damages as he had sustained, in addition to the relief prayed for in his original petition.

The cause was submitted to a jury upon special issues, and in response thereto they, in effect, made the following answers:

1. R. J. Willmann did represent to E. W. Kiehn that the notes he traded to him, Kiehn, secured by a lien on the Dimmitt county land, were gilt-edged, first-class, commercial paper.

2. That such representations so made by Willmann were false.

3. R. J. Willmann did represent to E. W. Kiehn that the notes he traded to him, Kiehn, secured by a lien on the Quanah lots, were good notes and well secured.

4. That the representations so made by Willmann were false.

5. R. J. Willmann did represent to E. W. Kiehn that the notes he traded to him, Kiehn, secured by a vendor's lien on the Pecos county land were good, and that they were gilt-edged, and that the consideration recited in the deed had been paid.

6. That the representations so made by Willmann were false.

7. That each and all of such representations so made by Willmann to Kiehn were false and were known to be false by Willmann when made, and were made by him for the purpose of deceiving Kiehn and inducing him to trade for said notes.

8. Kiehn did rely upon such representations so made by Willmann to him, and made no manner of investigation as to the value of said notes sold and transferred to him by Willmann.

9. R. J. Willmann did tell Kiehn that he, Willmann, had not seen the property for which said notes were given.

10. Willmann did not furnish to Kiehn a description of the property securing said notes in order that he might be able to investigate the value of the securities offered, and suggest that he do so, before the trade was concluded.

11. None required nor made.

12. Plaintiff, Kiehn, turned over his papers relative to his trade and controversies arising therefrom to his attorney for attention about the 15th day of March, 1916.

13. Kiehn was warned by some one on or before February 3, 1916, that the notes traded to him by Willmann were no good.

14. Some party living in the town of Quanah did, prior to the 28th day of March, 1916, write Kiehn that the Quanah lots, which secured one set of notes, were worth no more than $10 each.

15. Kiehn, after discovering that the property securing the notes traded to him, or some part thereof, was insufficient security therefor, did advertise such notes for sale on or about the 28th day of March, 1916, and did try to sell said notes, or some of them, to Adolph Seidemann on or about the 4th day of April, 1916, and to any other person or persons, for the purpose of raising money to pay off his note at the bank and to obtain a benefit therefrom.

16. The offer of Kiehn to sell said notes to Seidemann was with a bona fide intention of disposing of the notes, and was not made for the purpose of ascertaining the true commercial value of the notes, as contended by Kiehn.

17. After Kiehn had discovered the fraud practiced upon him by Willmann which induced him to trade for said notes, he recognized the sale of the notes to himself as existing, and did thereafter continue to deal with them as his own with the intent to obtain the benefit of said sale and of the notes transferred and delivered to him.

18. After Kiehn discovered said fraud on the part of Willmann he recognized the sale of the land in controversy to Willmann as existing, and he did thereafter continue to deal with the same as the property of Willmann and did try to sell the same for Willmann for a commission.

19. Before Kiehn offered the notes he got from Willmann for sale and before he advertised them for sale he did have knowledge of such facts as would put a man of ordinary care and prudence upon inquiry as to the value and extent of the security for said notes and the solvency of their makers.

20 and 21. The evidence shows that W. B. Dennis and C. P. Thrailkill, the makers of the notes in question, are both insolvent and without sufficient means to pay their respective obligations.

The trial court approved the findings of the jury and in the judgment rendered recites, in substance, that the contract of sale and exchange of properties between the parties was induced by the fraudulent representations and deceitful conduct on the part of appellee, as alleged by appellant; but it is further recited therein that it also appeared to the court from the findings of the jury that while appellee, Willmann, was guilty of fraud in the transfer of the vendor's notes to appellant, Kiehn, which were insufficiently secured, as a part of the consideration for the deed to the land in controversy, that Kiehn, after discovering the fraud practiced upon him by Willmann, advertised the notes for sale which he got from Willmann in said trade and endeavored to sell them for the purpose of raising money to pay off the $1,200 note executed by him to Willmann which was held by the bank, and to obtain a benefit therefrom, and that he dealt with the notes transferred to him by Willmann, after the discovery of said fraud, as his own property,

and that he also, after discovering said fraud, dealt with the land which he had conveyed to Willmann as the property of Willmann, and thereafter endeavored to sell the same for Willmann as his property for a commission. Following these recitals the court rendered the following judgment:

"It is therefore and thereupon considered, ordered, and adjudged by the court that the plaintiff, E. W. Kiehn, take nothing by his suit and that he pay all costs of this suit.

"It is further considered, ordered, and adjudged by the court that the deed of conveyance from the plaintiff, E. W. Kiehn, to the defendant, R. J. Willmann, of date January 31, 1916, and recorded in volume 101, on page 50, of the Deed Records of Fayette county, Tex., conveying 161.9 acres of land, a part of the Noah Karnes league, in Fayette county, Tex., and fully described in said deed, be and the same is hereby declared a valid and subsisting deed, and that said defendant, R. J. Willmann, be quieted in his title and possession to said land and in and to his title and possession of said note for $1,200, and that he recover of plaintiff, E. W. Kiehn, all costs in this suit."

From this judgment E. W. Kiehn has appealed.

Assignments 1 to 11, inclusive, are complaints of the refusal of the court to permit the plaintiff to introduce certain evidence which he contends tends strongly to support his allegations that the defendant, Willmann, is a swindler, and that he did defraud him, Kiehn, as alleged by him.

[1] In view of the findings of the jury in answer to questions 1 to 10, inclusive, submitted by the court, which were amply supported by the evidence, to the effect that the fraud as alleged was practiced upon Kiehn and that it induced him to make the contract in question and to transfer the property involved in this suit and to execute and deliver to Willmann his note for $1,200, the refusal of the court to admit the evidence tendered, if error, became harmless. Such refusal furnishes no cause for a reversal of the judgment rendered, and in view of the disposition we shall make of this appeal it is no longer a material question and need not be discussed further in this opinion.

[2] We have reached the conclusion that the only material question left for our determination is: Was there sufficient evidence to support the answers of the jury to special issues 12 to 19, inclusive? If there was, the judgment of the trial court must be affirmed; if not, such judgment should be reversed and the cause remanded for another trial. We think there can be no controversy but that such answers of the jury, if supported by sufficient evidence, convict appellant under the well-established rule of law of having waived the fraud practiced upon him by appellee and of having ratified the contract which he now seeks to rescind. Evans v. Goggan, 5 Tex. Civ. App. 129, 23 S. W. at page 854; Wells v. Houston, 23 Tex. Civ. App. 629, 57 S. W. 597; Winters v. Coward, 174 S. W. 940; Zundelowitz v. Waggoner, 211 S. W. 598; Pomeroy on Cont. (2d Ed.) § 279; Pomeroy's Equitable Jurisprudence (3d Ed.) §§ 964 and 965.

There being no question but that palpable fraud had been committed by Willman, by means of which he obtained a deed from Kiehn conveying to him the land in controversy, and also the note of Kiehn for the sum of $1,200, as before stated, the only important inquiry now is: Is the evidence tending to support the answers of the jury to special issues 12 to 19, inclusive, sufficient to support such answers?

The undisputed evidence shows that appellee, Willmann, as part consideration for the land of appellant and for appellant's $1,200 note which was delivered to him, transferred to appellant, Kiehn, the following notes, three notes aggregating $2,100, purporting to be secured by a first lien on 10 lots in the city of Quanah, Hardeman county, Tex., notes aggregating $2,250, purported to be secured by a first lien on 176 acres of land in Pecos county, Tex., and one set of notes aggregating about $2,250 purported to be secured by a lien on 70 acres of land in Dimmitt county, Tex.; that one W. B. Dennis was the maker of the first two sets of notes and one C. B. Thrailkill the maker of the third set; and that the contract between the parties to this suit was consummated on the 31st day of January, 1916.

Appellant, Kiehn, testified that in a few days after he got the notes from Willmann, on the 31st day of January, 1916, the people of Schulenberg told him that the notes were no good; that he got the information that the notes were no good at Schulenberg from the First National Bank; that when he turned the matter over to his attorney about the 15th day of March, 1916, he knew, or believed rather, that the notes were worthless and of no value; that they were no good. He also testified that when he turned the matter over to his attorney about March 15, 1916, he gave his attorney such information as he had acquired relative to the value of the notes and the property securing same, and that he turned over to said attorney all letters he had received relative to such matters, and that at that time he had reached the conclusion that the notes were worthless. Again he testified:

"I closed the deal the last day of January. I found out that there was something wrong about these notes shortly after that; I judge about two or three weeks after that, maybe a month. Possibly I did write Willmann three days after that and told him that friends of mine at Schulenberg said the notes were not worth anything; were no good. It has been so long ago, I don't know who these friends were. Possibly the bank informed me or told me on or about the 3d day of February, 1916, that

these notes I got from Willmann and exhibited to them were no good. Some time after February 3d, after I was told that the notes were no good, I made inquiry of people that lived in Pecos, Dimmitt, and Hardeman counties. I don't know exactly when. I don't know exactly when I wrote that letter to a friend of mine in Quanah. It might have been in February and it might have been in March."

Again he said:

"I, went to Judge Duncan some time in March, according to my best recollection. I gave him all the information I had in my possession at that time. * * * At the time I brought suit I was convinced that the notes were worthless. * * * I wrote to one or two loan offices in San Antonio and they wrote they wouldn't have anything to do with the notes. I have no idea the name of them now. I wrote a pretty good while after I had them, shortly before I filed suit, evidently in March. I cannot tell the time exactly. I cannot tell the name of the loan company to whom I wrote."

J. F. Johnson testified by deposition as follows:

"Something like three or four months ago Mr. Kiehn, or some person of such name, wrote a letter to some real estate agent in Quanah, Tex., and the same was placed in my box at the post office. And in this letter it asked that the agent try to sell some notes that he had which were secured on some farm lots in Quanah. I do not know that this was Mr. Kiehn, but the name was very similar. I answered this letter and asked for a description of the lots, and told him I would help him dispose of the notes. And I received a letter in a few days giving description of the lots and notes, and after I had examined the lots I wrote him and told him that the lots were worth about $10 apiece. I did not keep these letters and cannot attach them hereto."

Testifying with reference to a letter written by Mr. Hankins to him, wherein it was stated the ten lots in Quanah were not worth more than $10 each, appellant said:

"I exhibited that letter from Mr. Hankins, I know, or whatever his name is, to Judge Duncan when I employed him. The letters must be among the papers; as near as I know I turned them over to Judge Duncan. I had that information about the value of the property before I employed Judge Duncan."

The following facts were shown by the evidence:

That on February 3, 1916, three days after he got the notes, Kiehn wrote R. J. Willmann as follows:

"I just arrived home and upon investigation find that my client who is interested in my farm bought a small place in his neighborhood. I do not think that this is enough land; however, I shall investigate, and if I think that we can do something I will write or telephone you, if necessary. I made some inquiry with reference to selling my land notes, but seem to meet with many adversities. My friends told me that these notes are 'no good.' "

That on February 16, 1916, appellant, Kiehn, wrote appellee as follows:

"I am devoting my entire time and attention at present toward selling one set of the notes which I obtained from you, but in every instance I meet with adversities, which disappoint me very much."

That one Emil H. Baumgarten, who brought suits against appellee, Willmann, wherein he charged fraud and deceit on the part of Willmann, and appellant, Kiehn, were neighbors; that they went to La Grange, the county site of Fayette county, together and there consulted and employed the same attorney at the same time to bring their respective suits.

On March 21, 1916, appellant, Kiehn, wrote Willmann as follows:

"I do not think that there is much business with the parties interested in the 162-acre farm. It will be a good idea for you to come here this week; I may be absent next week."

With reference to this postal Kiehn testified:

"I wrote this postal card dated March 21st; that is my handwriting. The land it refers to is 161.9 acres I conveyed to Mr. Willmann. On March 21st I was attempting to sell this land for Mr. Willmann, and he was to pay me a commission. The commission was to be 5 per cent."

On the 28th day of March, 1916, appellant placed in the San Antonio Express an advertisement reading as follows:

"Notes for Sale.

"$4,400 worth of first vendor's lien 8 per cent. notes for sale at a great discount. Notes well secured, perfect title; 124 Schulenberg, Texas."

On the 1st day of April, 1916, one Adolph Seidemann, of New Braunels, wrote Kiehn as follows:

"I noticed in San Antonio Express that you are offering for sale notes aggregating the sum of $4,400 (forty-four hundred dollars), said notes bearing interest at the rate of 8 per cent. per annum, said notes being secured by lien.

"Please write me full particulars as to these notes, by whom signed, when due, the amount of each, and the security securing the payment of each, and the residence of the signers of said notes; also whether you have abstract of title to the security, and if you have not abstracts will you furnish abstracts of title for examination?

"Please advise me at your earliest convenience."

On the 4th day of April, 1916, Kiehn replied:

"I have your favor of the 1st inst., relative to my ad in the San Antonio Express concerning certain notes.

"I have one set of notes amounting to $2,250, payable $250 in June, 1916, $500 in June, 1917, 1918, 1919, and 1920. These notes are secured by 70 acres of land in Dimmitt county.

I have an abstract down to date and title has been investigated by a guaranty company and approved. I have their written statement that said notes are first and the only lien on said land. These notes bear 8 per cent. interest; are signed by C. P. Thrailkill, who resides in San Antonio. Since advertising these notes I changed my mind concerning the other notes that I hold, which are secured by land further West. I desire to retain said notes and they are off the market.

"Hoping that you may be in a position to handle the above-described notes, which I am willing to discount liberally, together with accrued interest. Telephone me upon receipt of this letter and I shall forward abstract for your investigation.

"Any favor and courtesy that you may be good enough to grant me herein, I assure you, shall be very highly appreciated, and thanking you in advance for an immediate and favorable reply, I am

"Respectfully yours,        E. W. Kiehn."

Again Kiehn testified:

"It has been quite a while ago when I offered them (the notes) to Mr. Barber in San Marcos, who answered my ads. I don't know; quite a number answered them. It appeared to me I did offer them for sale to somebody in New Braunfels."

Again:

"I put the advertisement in the paper because I wanted to, thought I might have sold one set of notes. I was trying to find out whether the notes could be sold. I wanted to see whether or not the notes were salable, if some one would be interested in them. I got a letter from a man by the name of Seidemann, and I replied to this letter. I did not intend at that time to give up my right to recover from Willmann this land I am now suing for. The notes secured by the Quanah lots were not in the hands of the bank as collateral; it was a note executed by Thrailkill. The gentleman by the name of Seidemann wrote me that he had seen my advertisement and asked me to give him more particulars about it, and then I offered him the notes secured by the 70 acres in Dimmitt county. These are the notes that the bank have. If Seidemann had replied to me that he would buy the notes, of course I would have sold them to him. I told him that I would sell them. I wanted to do so, so I could pay off the note the bank held. That was the purpose I was trying to sell the notes for. I suppose I offered these notes to Mr. Seidemann on the 4th day of April, 1916. I wanted the money for the purpose of paying off the bank that held the notes, so that I could have them back."

It will also be noted that while appellant furnished his attorney with the information as to the acts of fraud practiced upon him by Willmann about March 15th, his suit was not filed until the 3d day of April thereafter.

[3] We have reached the conclusion that the evidence was amply sufficient to support the findings of the jury to special issues Nos. 12 to 19, inclusive, and that it was the duty of the trial court upon such findings to render the judgment it did render.

In the case of Evans v. Goggin, 5 Tex. Civ. App. 129, 23 S. W. 854, it was held that fraud may be ratified and remedies against it may be lost by acquiescence; that is, as is said by Pomeroy, by some act, not deliberately intended to ratify, but recognizing the transaction as existing, and intended in some extent at least to carry it into effect, and obtain or claim the benefits from it. 2 Pomeroy, Eq. Jur. §§ 964 and 965.

In Wells v. Houston, 23 Tex. Civ. App. 653, 57 S. W. 594, it is said:

"It is well settled that a party having recognized a contract as existing, and having done something to carry it into effect and to obtain or claim its benefits and having thus taken his chances, cannot be suffered to repudiate the transaction and allege its voidable nature."

In Winters v. Coward, 174 S. W. 940, it is said:

"The remedy of rescission and cancellation is no prime favorite of courts, and slight circumstances, tending to show a purpose or intent upon the part of the person seeking a rescission to waive such right, will prevent the granting of the relief. The right of rescission is one that can be waived, and when waived, the rights of the parties are placed upon a new basis. Scarborough v. Arrant, 25 Tex. 129; Moore v. Giesecke, 76 Tex. 543, 13 S. W. 290; Kallison v. Poland, 167 S. W. 1104; Kempner v. Thresher Co. [54 Tex. Civ. App. 650], 118 S. W. 714; Trausettel v. Kjellman, 163 S. W. 689."

In Sundelowitz v. Waggoner, 211 S. W. 598, it is said:

"Fraud which renders a contract voidable may be waived or condoned and the contract ratified by the party defrauded, but acts relied upon as ratification must be done after the person defrauded 'has obtained full knowledge of all the material facts involved in the transaction, has become fully aware of its imperfection and of his own rights to impeach it, or ought and might, with reasonable diligence, have become so aware.' 2 Pomeroy (3d Ed.) par. 964; North American Accident Insurance Co. v. Miller, 193 S. W. 758; Ingram v. Abbott, 14 Tex. Civ. App. 583, 38 S. W. 626; Black on Rescission and Cancellation, par. 591."

In 3 Pomeroy's Equity Jurisprudence, §§ 964 and 965, the following rule is stated:

"Sec. 964. Where a party originally had a right of defense or of action to defeat or set aside a transaction on the ground of actual or constructive fraud, he may lose such remedial right by a subsequent confirmation, by acquiescence, and even by mere delay or laches. * * * Contracts which are merely voidable because contrary to good conscience or equity may be ratified, and thus established. If the party originally possessing the remedial right has obtained full knowledge of all the material facts involved in the transaction, has become fully aware of its imperfection and of his own rights to impeach it, or ought and might, with reasonable diligence, have become so aware, and all undue influence is wholly removed, so that he can give a perfectly free consent, and he acts

deliberately and with the intention of ratifying the voidable transaction, then his confirmation is binding, and his remedial right, defensive or affirmative, is destroyed.

"Sec. 965. * * * The theory of the doctrine is that a party having thus recognized a contract as existing, and having done something to carry it into effect and to obtain or claim its benefits, although perhaps only to a partial extent, and having thus taken his chances, cannot afterwards be suffered to repudiate the transaction and allege its voidable nature."

By the fourteenth assignment it is insisted that the court erred in refusing to submit to the jury the right of appellant to recover actual and exemplary damages.

[4] We think the court properly refused to submit such question, for the reason that appellant's suit as made by his original petition, upon which he went to trial, was in our opinion a suit in equity for the rescission of a contract and to vacate a deed and note executed by appellant to appellee and to recover back certain property described in said petition, and not a suit for damages. We do not think the allegations of the original petition, or prayer therein, were sufficient to admit of the submission of the question of damages, either actual or exemplary.

[5] We also conclude that the allegations in neither the first nor second supplemental petitions form any basis for the recovery of damages. The matters alleged in the supplements attempting to set up claim for damages were in no sense a reply to any allegation in appellee's answer. It is provided by rule 5 for district and county courts (142 S. W. xvii) that—

"The plaintiff's supplemental petitions may contain exceptions, general denials, and the allegations of new facts not before alleged by him, in reply to those which have been alleged by the defendant."

Rule 15, among other things, provides:

"When either party may have occasion to plead new facts, additional to those formerly pleaded by him, which constitute an additional cause of action or defense permissible in the suit, he shall present it as an amendment to the original petition or original answer." Gossett v. Vaughan, 173 S. W. 933; Burks v. Burks, 141 S. W. 337.

In the first case cited it is held that—

"Under district court rules 4 and 5 (142 S. W. xvii), providing that the original petition shall state all facts constituting the cause of action, and that the supplemental petitions may contain exceptions, general denials, and allegations of new facts in reply to facts alleged by the answer, the court in determining the cause of action stated need not consider the supplemental petition."

In Burks v. Burks it was held that—

"Supplemental petitions are not designed for supplying averments of fact which should have been made in the original petition. Townes' Pleading, pp. 309–321."

We have considered all of appellant's assignments, and as we have concluded that none of them presents reversible error they are all overruled without a detailed discussion of each of them separately.

Having concluded that there was no reversible error committed in the trial of the cause, the judgment of the trial court is affirmed.

Affirmed.