DOROTHY GINSBERG, respondent,

*v.*

NORTON A. WOLTERS and MARGUERITE D. WOLTERS,
appellants.

[Decided January 19th, 1923.]

On appeal from a decree of the court of chancery advised
by Vice-Chancellor Foster, who filed the following opinion:

"This bill is filed to foreclose a third mortgage for $67,000
given by the defendant Norton A. Wolters to complainant as
part payment for the purchase or exchange of an apartment-
house property in Orange.

"Defendants have filed an answer and counter-claim in
which they allege that by the false and fraudulent representa-
tions of one Morris Gordon—the actual complainant and the
real owner of the mortgaged premises, and by the conceal-
ment by him of material facts, and by artifice and deception
practiced by him, and by the exercise of undue pressure and
importunity, the defendant Wolters was induced to purchase
or to trade his contingent interest in his father's estate for
the mortgaged premises, at the grossly excessive value of
$300,000, and to execute the bond and mortgage in suit.

"On the hearing, persistent efforts were made to show that
Wolters, at and for a considerable time prior to this trans-
action, was under the influence of intoxicating liquors to
such an extent that he was incapable of transacting business,
and did not know or appreciate what he was doing in the
purchase or exchange of this property. This contention was,
however, abandoned on the argument; and in the course of
the hearing it was admitted that complainant was a mere
dummy for Gordon.

"The controversy over the mortgage arises out of the following transactions:

"The defendant Wolters is about forty years old, and up to 1918 he had been engaged for some years in the management of a wholesale produce business in Newark. About June or July, 1920, Wolters then not being in business, desired to obtain a loan of about $20,000 on his contingent interest in his father's estate, and which interest is to become vested in him if he lives until 1927. This interest has been estimated to be worth from $100,000 to $150,000, and Wolters since the death of his father had been in receipt therefrom of a gross annual income of about $8,500. Among those to whom Wolters applied for this loan was Robert Stoutenburgh, an old friend, engaged in the brokerage business in Newark, and Stoutenburgh, about July 10th, 1920, introduced Wolters to Gordon as one who might make him the loan. Gordon was unwilling to do so, but suggested he might be willing to make an advancement of some money to Wolters if Wolters cared to trade his contingent interest in the estate for the apartment-house property, which Gordon valued at $300,000, the property being encumbered by a building and loan association mortgage for $110,000, reduced at the time to about $103,000, and by a second mortgage for $40,900. It was at this first interview, which Wolters states occurred about July 15th, with no one present but himself and Gordon, and when Wolters claims he was intoxicated, that the alleged misrepresentations are said to have been made by Gordon, and when Gordon is said to have deceived and coerced Wolters into making the transaction, although Wolters claims the same misrepresentations were repeated by Gordon at subsequent interviews. Wolters, notwithstanding his drunken condition and his claim that he did not understand the nature or significance of what he was doing, distinctly remembers and testifies that Gordon then told him the apartment contained one hundred and sixteen rooms, renting at $20 each, and had ten garages, renting monthly at $15 each; that there was a contract to pay Feist & Feist, as rental agents, $1,000; that the apartment was renting for $30,000 a year, at the rate

of $2,500 monthly; that he figured on the basis of the rental per room, and found the annual income might amount to $33,000; that Gordon stated that from October 1st, 1920, the annual rentals would amount to $40,000; that the cost of the upkeep would not exceed $8,000; that ninety per cent. of the tenants had consented to pay the increased rental; that the property had cost about $250,000; and that after he and Gordon had made some calculations from which he concluded the gross annual rental might amount to $43,000 after October 1st, 1920, and after Gordon had further represented that with these increased rentals and the stated cost of maintenance and the payment of all fixed charges, there would be a net monthly income from the property for Wolters of at least $1,000, Wolters then concluded he would make the exchange of his interest in the estate for the property; and that later Wolters found that every statement and representation thus made by Gordon were false and fraudulent, and were known to be so by Gordon when he made them; that he found the property had cost and was worth less than $200,000; that the rents did not then amount to $30,000 annually, and that they did not and would not amount to $40,000 annually after October 1st, 1920, and that the cost of maintenance was more than $8,000 annually, and that Wolters could not and would not receive a net monthly income of $1,000 from the property, as Gordon at the time well knew.

"Both Stoutenburgh and Gordon contradict Wolters and state that at this interview no such statements or representations were made, and they agree in stating that what then occurred was that Wolters asked for a temporary loan, which Gordon refused to make, and then Wolters asked if Gordon would be interested in buying an interest in his father's estate, to which Gordon replied he would not be interested in buying such an interest, but that he had an apartment-house he might be willing to trade for such an interest; Wolters stated he would think it over, and he and Stoutenburgh left without anything further being said or done.

"About July 15th, according to Gordon, he had another call from Wolters, who wished a loan of $20,000, which

Gordon refused to make. Wolters then inquired about the apartment-house, and Gordon then gave him the foregoing particulars about the property, and the rental income and also the prospective income. Gordon states that no one but himself and Wolters were present at this interview; that he made no false or misleading statements about the property; that Wolters was perfectly sober, and that he told Wolters he had owned the property only two months; that the rental agents had assured him that after October 1st they expected by raising the rents that the gross annual rentals would be $40,000, and that the agents had also told him the upkeep charges would not exceed $8,000, and he suggested that Wolters call on Feist & Feist, the rental agents, for more detailed information. Wolters left him with the statement that he would investigate the matter. On July 24th, Stoutenburgh received, at Cape Cod, a letter from Wolters, in which he stated he was convinced he could make a better deal with Gordon than he could with parties in Philadelphia, to whom he had applied for a loan, and that Gordon would not close the matter unless Stoutenburgh was present, and on July 25th Wolters told Gordon he did not think the property was worth $300,000.

"And it appears, although Wolters denies it, that he also told others that he had the property appraised and found it was not worth that sum.

"On July 27th, at Wolters' request, Stoutenburgh accompanie him to the property, where they inspected three apartments and spoke to their occupants, and the rest of this day until nearly six o'clock was spent by them in Gordon's office, where, with Gordon and Charles Jones, his attorney, they discussed all the details of the transaction, including Stoutenburgh's commission, which was reduced to $2,500. Wolters states he was fairly sober on this day, and all other witnesses to the transaction states that neither on this date nor on any other, while the matter was being considered and concluded, was Wolters ever under the influence of liquor. On this day the parties prepared an agreement by which the price of the property was fixed at $300,000, which Wolters was to pay

by an assignment of his interest in his father's estate, which was valued, for the purpose of the agreement, at $85,000; the property was to be conveyed subject to the two mortgages, aggregating $150,000, and the balance, including $10,000, which Gordon was to advance to Wolters, was to be secured by a purchase-money mortgage. Wolters states he does not remember what happened at this conference; that he took practically no part in it, nor in fixing the value of the property, nor the value of his interest in the estate, nor in connection with any of the details of the transaction, and that he did not see and did not take with him when he left a copy of the agreement for further consideration.

"He is contradicted on every one of these matters by Stoutenburgh, Gordon, Jones and Miss Snyder, Gordon's stenographer, and particularly by the latter, who states Wolters participated in the preparations of the rental statement, showing the gross rentals then to be about $25,000 and not $30,000, and that he also participated in the dictation of the terms of the agreement and that she remained later than usual typewriting the agreement, as Wolters desired to take a copy of it with him, which he did.

"On the following morning Wolters returned to Gordon's office and he states he was so intoxicated throughout the day that he cannot recall what papers he signed, nor what part he took in the transaction; he does remember he expressed a desire to consult counsel and at Gordon's suggestion that he have a lawyer pass upon the papers, accompanied by Jones and Stoutenburgh, he called on Mr. Isherwood, who glanced over the papers and refused to have anything to do with the matter. In this he is corroborated by Mr. Isherwood; but the latter does not recall that Wolters appeared to be intoxicated.

"The parties then returned to Gordon's office, where the agreement, deed, bond and mortgage for $83,000, the assignment of Wolters' interest in the estate and Wolters' affidavit, a letter signed in complainant's name, stating the expected amount of gross rentals after October 1st, 1920, and a check from Gordon to Wolters for $9,800, were all executed and

placed in escrow with Stoutenburgh pending the delivery
of assignments of Wolters' life insurance policies for $51,500
to Gordon, and at this time Gordon advanced to Wolters
$200 on account of the $10,000.

"Before these papers were executed, all the witnesses state
that on Wolters' insistment there was excepted from the
assignment of his interest in the estate his share in certain
real estate on Central avenue, Newark, and also all property
and interest in the estate he might inherit by the death of
any of his brothers or sisters; and there was also excepted
from the transaction certain disability insurance carried by
Wolters.

"On the following morning, July 29th, Wolters called on
Gordon and it was agreed to increase the value of Wolters'
interest in the estate from $85,000 to $100,000, and the
increase was credited by reducing the amount of the mort-
gage from $83,000 to $68,000; this correction was made in
the papers and noted by Wolters' initials; the amount to be
advanced Wolters was increased from $10,000 to $15.000;
this additional $5,000 was to be repaid by the terms of the
mortgage in monthly installments of $1,000 each, beginning
with August 15th, 1920, and the balance of the mortgage
was to run for three years, with interest thereon payable on
the fifteenth of every month. The letter relating to rents,
deposited in escrow, was destroyed, and in its place Gordon,
in complainant's name, gave Wolters what they called a
guarantee reading as follows:

" 'Whereas, through my attorney I have stated that the gross rental
of said premises beginning October 1st, 1920, to October 1st, 1921,
is, or will be, forty thousand ($40,000) dollars * * *. Therefore
should the gross rental for the year * * * be less than * * *
forty thousand ($40,000) dollars, I agree that the difference shall be
deducted from the amount of my mortgage on October 1st, 1921.'

"Gordon further agreed to pay the annual premiums on
the life insurance policies, amounting to about $1,600, and
to return this insurance to Wolters if he were living at the
date of distribution of his father's estate. The transaction

was then closed and Wolters received his deed and the check for $9,800, and entered into possession of the property and continued Feist & Feist as its rental agents and managers.

"On August 24th, 1920, Wolters received from Gordon the additional $5,000, and paid therefrom $1,000 for the August 15th installment due on the mortgage, and Gordon also gave Wolters at this time a copy of the settlement statement which was made up on July 28th or 29th. From the August rents Wolters on September 10th, 1920, paid Gordon $340 for the August interest due on the mortgage, and he has made no other payment on either principal or interest, although Wolters monthly thereafter received and used the rent checks for his personal and living expenses up to and including the month of December, and Mrs. Wolters has used for her own purpose the rent check for $300 which she received from the agents on January 28th, 1921.

"Defendants also contend that Gordon misled Wolters by not disclosing that he was the real owner of the property and not merely the attorney of complainant, as he pretended, while Gordon and other witnesses testify he repeatedly told Wolters of this fact, and also told him he kept title to the property in the name of the G. & J. Company, or in the name of complainant, as a mere matter of convenience.

"I am satisfied Gordon did not fully disclose his actual connection with the property until counsel made the admission in court that complainant was merely Gordon's dummy.

"It is also claimed that if the mortgage is valid, the bill was filed prematurely on February 1st, 1921, and that complainant is not entitled to a decree, because when the bill was filed the amount of the deficiency in the annual rentals for the year ending October 1st, 1921, between the amount realized and the guarantee of $40,000, had not and could not then be ascertained and credited on the mortgage. This deficiency is now estimated at about $7,000, and there is no reason why, if the mortgage be valid, the amount of this deficiency cannot be deducted by the terms of the decree.

"It is further claimed that throughout the transaction Wolters was without legal advice and that in some way Gor-

don, because he was a lawyer, took advantage of it. Not only is the fact of Wolters being without legal advice contradicted, but nothing is shown where Gordon as a lawyer acted improperly, and nothing is shown to justify the claim that because Gordon was a lawyer Wolters was at a disadvantage, and therefore suffered some injury.

"Wolters married his present wife, the defendant Marguerite O. Wolters, on September 21st, 1920, and about October 1st, 1920, he conveyed the mortgaged premises to her. Defendants state that she holds title thereto in trust for him. It appears that although both Mr. and Mrs. Wolters claim to have discovered from the rental returns and other sources by the middle of October, 1920, that Wolters had been defrauded in the transaction, they made no complaint to Gordon nor to anyone else about the matter until about January 8th, 1921, when Wolters consulted counsel. During all the period Wolters continued his efforts, up to and including December, to obtain for Gordon the additional life insurance he had promised him, and in December, 1920, defendants attempted to obtain through Stoutenburgh an additional loan of $5,000 on the property or to have him sell it for them. The explanation Wolters offers for his failure to charge Gordon with the fraud in this transaction after he discovered it October, 1920, is his ignorance of the law of election and rescission, and that he was relying on his guarantee; and in addition he claims that the $10,000 advanced to him by Gordon on July 28th-29th was a gift; that it was not to be secured by the mortgage in suit nor in any other way; and he further claims that an interest in his share of his father's estate, amounting to $25,000, which he had previously assigned to insure the payment of alimony to his former wife and child, was not to be included in the assignment of his share of the estate which he made to complainant. He testifies that it was not until he had consulted counsel in January, 1921, that he learned this $10,000 advancement was included in the amount of complainant's mortgage, although it was so stated and included in the agreement of July 28th, 1920, and although he paid interest on it to Gor-

don in September. When he learned from counsel about this $10,000, and that the assignment of his interest in the estate included the $25,000 interest which he had previously assigned to secure the payment of alimony, he forthwith undertook, through counsel, to rescind the sale.

"In Wolters' affidavit, sworn to before Jones on July 28th, he states, 'Besides the personal property which is set forth in the inventory and accounting (of his father's estate) there is included in said estate, Nos. 24 and 30 Commerce street * * * said Commerce street property, and the above said $25,000 (referring to the reference therein to the previous assignment to secure the alimony payments) are included in the assignment to Dorothy Ginsberg, but No. 18 Central avenue, Newark, N. J., and the portion I might receive by reason of the death of my sisters or brothers before distribution, is expressly excepted from said assignment,' and by the assignment itself, executed on July 28th, only Wolters' interest in the Central avenue property and the possibility of any additional share of the estate that might come to him through the death of a brother or sister, are excepted from the share of the estate assigned to complainant. Notwithstanding that the papers in the matter in express terms included the $10,000 advancement and the assignment of the $25,000 interest in the estate, Wolters insists he did not know these facts until he consulted counsel in January, 1921, and that when counsel gave him this information, he for the first time became aware of the extent to which he had been defrauded, and thereupon elected to rescind the sale.

"From the facts recited, and others not mentioned, from this lengthy record, there is ample proof, not only of defendants' delay in electing to rescind promptly after learning of the alleged fraud, but we have in addition conclusive proof of what the courts call—conduct—evidence of defendants' election to abide by this bargain and to enjoy the benefits of it. The first undisputed offer to rescind is made by the answer filed in March, 1921, eight months after the transaction, five months after they discovered the fraud in October, two months after defendants state they knew completely to

what extent they had been defrauded, over a month after they had used the rents from the property, and this offer was made only after they had been restrained from collecting further rents.

"Applying to this situation the rule of the cases in this court and in the court of errors and appeals (*Dennis* v. *Jones, 44 N. J. Eq. 513; Clampitt* v. *Doyle, 73 N. J. Eq. 678; Faulkner* v. *Wassmer, 77 N. J. Eq. 537,* and *Reed* v. *Soap Co., 81 N. J. Eq. 182*), it must be held that defendants did not promptly elect to rescind and that their failure to rescind within a reasonable time is plenary evidence of their election not to do so; and therefore the attempted rescission made by the answer was made too late, as it was made after defendants, by their conduct, had elected, with complete knowledge of the alleged fraud, to ratify and to keep the benefits of the transaction. It is insisted, however, that in January, 1921, Mrs. Wolters, on learning of the extent of the fraud, attempted, through counsel, Mr. Conover, to rescind the sale; but it appears from Mr. Conover's testimony that at the time he made the offer of rescission to Mr. Jones that Conover's firm had not decided to represent either of the defendants; that he called on Jones for information and then made the offer; that he was without authority to make the offer to rescind, and that he was without the funds to effectuate the offer if it were accepted; and it does not appear that Jones had any authority to accept or reject the offer, or that he ever communicated it, if it were made; which Jones denies, to either the complainant or Gordon; and I therefore conclude that no offer to rescind was made by either defendant until the answer was filed in March, and that it was then made after defendants, by their conduct, had elected to abide by the transaction and to retain the benefits of it, and after they, in order to continue in the enjoyment of their benefits, had opposed, in February, the appointment of a receiver for the rents of the property.

"On this feature of rescission, as well as on the main contention in the case relating to misrepresentations, I have reached the conclusion that defendants have not even

attempted to put the court in possession of the actual facts of the transactions; for Wolters' pretense that he did not know the extent of the fraud until counsel told him in January, is not only contradicted specifically by the express terms of the papers he signed, but by this pretense of ignorance on Wolters' part, he places Gordon, who he claims defrauded him, in the position of voluntarily increasing the value of Wolters' interest in the estate from $85,000 to $100,000, of voluntarily reducing his mortgage from $83,000 to $68,000, and also of voluntarily increasing the amount to be advanced to him by Gordon from $10,000 to $15,000; and, although, because of his alleged drunkenness, he does not remember that $10,000 of this loan was to be secured by the mortgage, he distinctly remembers that the repayment of the additional $5,000 was to be secured by this mortgage, and notwithstanding his drunkenness he is positive that Gordon made a gift of this $10,000 to him.

"While on the main contention in the case the evidence not only does not support Wolters' contention that he was induced to make the transaction by Gordon's fraud and deceit practiced upon him while intoxicated, but it conclusively establishes that in this matter Wolters was neither intoxicated nor ignorant; it shows him anxious to obtain a loan of money at any cost or sacrifice; and it also shows, notwithstanding his pretense of drunkenness, that months after the event he can recall with the most minute details and can recite with the greatest fluency page after page of misrepresentations he claims were made to him by Gordon. The evidence further shows that if the price of the property be considered excessive, it also shows that this price was fixed in connection with its exchange and not with its sale, and that Wolters was careful and capable enough to see that the benefits were not all on Gordon's side, because, in order for Gordon to gain anything by the transaction, Wolters must be living in 1927, or whenever his father's estate is distributed, and that $25,000 of Wolters' interest in the estate is taken by Gordon subject to prior claims

thereon; furthermore, Wolters' interest assigned to Gordon is subject to any loss the estate may sustain in principal or income, and Gordon is obliged to pay the annual premium on Wolters' life insurance and to reassign the same on distribution of the estate to Wolters, regardless of what Gordon may obtain from the estate of Wolters' father. Wolters only abandoned his pretense of ignorance and his plea of intoxication when compelled to do so by the contradictions of every disinterested witness and the evidence of his application for life insurance—the last being made about a month before this transaction, wherein he represented that he did not use, or very infrequently used, intoxicating liquors.

"Wolters in all his claims is contradicted in every detail of the transaction by the testimony of every witness to it, by many of the details of the matter which could not have been obtained from any one but himself, and by the false and misleading attitude he assumed before the court in his efforts to establish these claims.

"My conclusion is that the proofs do not support Wolters' allegations of misrepresentations, rescission or any of his other claims.

"A decree will therefore be advised for complainant for the balance of principal and interest due on her mortgage, less such amount as may represent the actual deficiency below $40,000 in the rent received from the property during the year ending October 1st, 1921.

"The terms of the decree may be settled on three days' notice."

*Mr. Charles Jones,* for the respondent.

*Messrs. Lum, Tamblyn & Colyer,* for the appellants.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Foster.

*For affirmance* — THE CHIEF-JUSTICE, SWAYZE, TREN-CHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, WILLIAMS, GARDNER, ACKERSON—14.

*For reversal*—None.