The bill in this cause is filed to rescind a sale made by the defendant to the complainant.
The defendant was the owner of and conducting a confectionery and ice cream store located at 122 Fourth street, in the town of Union, New Jersey. He had been engaged in the business for some years, and, after negotiating for about five days, made a bill of sale of the business to the complainant on April 9th, 1923.
Prior to the execution and delivery of the bill of sale, and to induce the complainant to purchase, the defendant represented that the business done by him in the preceding year amounted to $55,047, and the complainant, relying upon that representation, purchased the store for $25,000, to be paid as follows: $1,000 on the execution of the agreement; $7,500 on the delivery of the bill of sale; the assumption of a chattel mortgage then on the premises upon which there was due $4,600, payable in monthly installments, and by the delivery to the defendant of a chattel mortgage for $11,900, with interest at six per cent., payable in monthly installments of $400 each, evidenced by promissory notes, the first of said notes to become due and payable June 1st, 1924.
In order to convince the complainant that the business done by him aggregated $55,047, the defendant produced a little black book (Exhibit C-3), purporting to contain, by daily entries, the receipts of the business from January 1st, 1922, to December 31st, 1922, which receipts totaled $55,047. In making up this book, it is admitted that the dates were written in advance of the daily entries of the receipts. The handwriting expert produced testified that these receipts were not entered daily, but that great numbers of them were entered *Page 580 
at the same time; that the whole book was not written at one sitting, but at several times; and he analyzes the entries in the usual expert style to indicate that the book was not a true record of the business, but was manufactured. I regard it as unnecessary to go into the details of his testimony, as he has not only convinced me of the truth of his statements, but an inspection of the entries themselves indicates that they are not daily entries. The defendant says that the entries in this book were made every night around twelve o'clock, after the close of business; that his wife (who died before the hearing of the cause) took the money from the cash register — he standing by — and counted it, and made the entry for the day then and there. There is testimony of two discharged employes who say that this is not so; that they were at the store with the defendant and his wife until it closed, and left the store with the defendant, and that the cash was not taken from the cash register and an entry made in the books. These witnesses were rather hostile, which would rather weaken the force of their testimony; but, in view of the way this book was made up, I think their stories are credible.
A peculiar circumstance about these entries is that they run in dollars, without cents. This seems to me, at first blush, rather a strong circumstance against the verity of the book, because it is highly improbable that there was not a surplus of cents over the dollars in the cash register. There was offered in evidence a red book, kept while Orem owned the store, and from whom the defendant purchased about two years before (defendant being, at the time of its purchase, interested with Orem as a partner in the business). This red book kept by Orem, towards the end, also showed, excepting in a few instances, the receipts in dollars only, with no cents. The conclusion I have reached is that, for some purpose unexplained, the defendant allowed small amounts of money, perhaps in dollars and cents, to remain in the cash register for business for the next day.
A circumstance, however, which tends to support the theory that the book was not true reflection of the daily receipts *Page 581 
is this: It seems that in a business of this character, where ice cream is manufactured and sold, with candies and soda water, there is a rule, which seems reasonably certain, that the sales of ice cream, soda water, candies, c., average about four times the cost of the milk and cream and condensed milk used in the manufacture of the ice cream. Applying this rule (which has not been denied), I find that Schuten bought, in 1922, milk, cream and condensed milk which cost $9,764.49, which, multiplied by four, produces $39,057.96. Taking the amount of milk purchased by Schuten in 1923 down to the time he sold to Kammerer in April, and adding to it the amount of milk, cream and condensed milk purchased by Kammerer for the balance of the year, the purchase price of the milk, cream and condensed milk for that year amounts to $6,648.75, which, multiplied by four, amounts to $26,595, and the actual business done that year by both Schuten and Kammerer amounted to $27,256.58, or $661.68 more than the estimated business for the year based on the rule.
There is another rule which they give for the calculation of the annual receipts, viz., that the income from the sale of ice cream is from two and a half to three times the cost of the milk, cream and condensed milk. Multiplying the $9,764 by two and one-half, the gross income from ice cream would be $23,311.22. Defendant says that the candy sales produce about one-third of the amount received from the sale of ice cream (which, in this instance, would be $7,770), and that the receipts from the sale of soda water amount to $7,000 a year. Adding these figures, it gives a total of $38,084 for the year. And if we treat the income from ice cream as three times the cost of the milk product, it will amount to $29,293; and adding the one-third of the income from cream on account of the candy sales ($9,754) and $7,000 for the estimated return from soda water sales, the total income would be $46,057 plus, or about $9,000 below the total given in the black book. The above calculation, taking the view most favorable to the defendant, tends to establish the fraudulent character of the black book. *Page 582 
To justify the falling off of the sales in 1923, some of the experts say (and it is not denied) that the summer of 1923 was the coldest in fifty years, and that business fell off from forty to fifty per cent. If this were true, it would account for the business here falling off considerably, but not to the extent of forty or fifty per cent. for the whole year.
The conclusion I have reached is that the business of the defendant for 1922 amounted to a sum between $39,000 and $46,000, and the falling off of the complainant's trade in 1923 to about $27,000 was due to the cold weather, augumented, possibly, by the fact that the complainant lost trade by not conducting his business in a suitable manner, as charged.
But the defendant contends that, assuming that this fraudulent misrepresentation has been proven, "the complainant, with full knowledge of the situation, made an election of the remedies afforded to him, and that he had elected to affirm the contract to keep the property, and, therefore, the bill for rescission filed in January, 1924, cannot be sustained," citing Dennis v.Jones, 44 N.J. Eq. 513; Clampitt et al. v. Doyle, 73 N.J. Eq. 678,683, 684; Faulkner v. Wassmer, 77 N.J. Eq. 537, 543, 544;Ginsberg v. Wolters, 94 N.J. Eq. 532; 121 Atl. Rep. 730, 733.
The facts are as follows: Peters, the agent who negotiated the sale, being called as a witness for complainant, says that the complainant expressed dissatisfaction with his purchase two or three weeks thereafter, saying that he did not think the store would ever bring the money; that two or three months later he told the witness that the defendant "had defrauded him;" that "he paid $10,000 too much;" that "the store wasn't worth $15,000," and he also made the same statements during the summer time. Complainant says, after the expiration of a month, he made up his mind that the figures in the book were wrong, and that it was a fraud. Two or three weeks after the purchase he consulted Mr. Schneider, a member of the bar. He says he told Schneider he had been defrauded, and he says that he was advised that he give back the property, or offer it back and *Page 583 
sue for damages, "but it would cost money." He was also advised by Schneider to "give the place a fair chance; that they didn't have summer weather," and that he told him to see "what the next month was going to be." He says the good season is over in October, and that during all this time the business did not pick up, and he was satisfied the black book was wrong.
Mr. Harber, a solicitor of this court, says that on December 11th, 1923, the complainant, with his counsel, Mr. Schneider, called on him — he having theretofore represented the defendant — and that Mr. Schneider had the black book and discussed the matter of misrepresentations. Finally, the complainant said he wanted some settlement whereby the defendant should reduce purchase price, reduce the mortgage, and also the monthly payments. This is denied by the complainant. But the force of his denial is greatly weakened because he has not produced all the evidence of which the nature of the case is susceptible. Mr. Schneider had been his counsel for a period beginning two or three weeks after he purchased the property down to, at least, December 11th, 1923, when they, together, visited Mr. Harber's office. He, if called, could have testified to what transpired at the conference with Harber, and also as to other things to which the complainant testified; but he was not called.
In addition to the foregoing facts, on May 8th, 1923, at a time when he had reason to believe that the black book was a fraud, the complainant contracted to put in an ice cream machine plant at a cost of $6,000. He says this was necessary, as the old plant was rundown, and he wanted to be ready for the good season when it arrived.
(Referring to the black book, it shows, in addition to the year's receipts for 1922, aggregating $55,047, the daily receipts for January, February and March and the first four days of April, 1923. From a comparison of these items with the income for the same months in 1922, it appears that the receipts for 1923 were less than those for 1922, in the following amounts: January, 1923, about $1,000; February, *Page 584 
1923, about $1,500; March, 1923, about $1,800. From April 1st until December 1st, 1023, the receipts were less than similar months of the preceding year in the following sums: April (including receipts by both complainant and defendant), $2,700; May, $3,500; June, $3,600; July, $2,600; August, $2,800; September, $3,100; October, $2,200; November, $1,300; December, $1,600.)
As above stated, the complainant assumed the payment of the mortgage to Steinbacher for $4,600, and paid the monthly installments on this mortgage down to January 1st, 1924. Nothing was paid on account of his mortgage to the defendant, because the first note secured thereby did not fall due until June 1st, 1924. During all this time I am satisfied that the complainant believed the black book to be a fraud, and his purpose was to get an abatement of the purchase price. This is testified to by Mr. Peters (who was called by the complainant), who said that, shortly after the purchase, and during the summer time, the complainant claimed that he was defrauded and had paid $10,000 too much, and that the place was not worth more than $15,000; and the testimony of Mr. Haber, that the complainant wanted to meet Schuten to talk over the reduction in the price of the business; and his own testimony, generally throughout, that he wanted to meet Schuten to discuss the matter with him, and made several efforts to do it.
On the foregoing facts I have reached the conclusion that the complainant, with full knowledge of the facts, at least, as early as July or August, 1923, elected to retain the property and seek to obtain the return of a part of the purchase price or damages. He had been employed on the premises by Steinbacher years before, knew it was a good site for business, and, in fact, the other witnesses say it is an excellent site.
This brings the case within the rule laid down in Dennis v.Jones, Clampitt et al. v. Doyle, Faulkner v. Wassmer andGinsberg v. Wolters, supra.
I will advise a decree dismissing the bill. *Page 585